STATE, Respondent, v. LUCYNSKI, Appellant.

*No. State 65. Argued September 14, 1970.—Decided October 6, 1970.*
(Also reported in 179 N. W. 2d 889.)

For the appellant there was a brief by *Catania & Neubecker*, attorneys, and *Edward F. Neubecker* of counsel, all of Milwaukee, and oral argument by *Edward F. Neubecker*.

For the respondent the cause was argued by *Lee Edward Wells*, assistant district attorney of Milwaukee county, with whom on the brief were *Robert W. Warren*,

attorney general, and *E. Michael McCann,* district attorney.

ROBERT W. HANSEN, J.  The defendant raises one issue, and relies upon one prior decision of this court as the basis for so doing.

The issue is: Did the trial court err in refusing to submit manslaughter as an additional alternative verdict that the jury might return?

Three forms of verdict were submitted to the jury: Guilty of murder in the first degree, guilty of murder in the second degree, and not guilty.  Defendant's request for the submission of manslaughter to the jury was rejected by the trial court.

Murder in the first degree requires proof of ". . . the death of another human being with intent to kill [mental purpose to take the life of another human being] that person or another . . . ." (Sec. 940.01, Stats.)

Murder in the second degree requires proof of ". . . the death of another human being by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life, . . ." (Sec. 940.02, Stats.)

Manslaughter requires proof of ". . . the death of another human being . . . (1) Without intent to kill and while in the heat of passion; . . ." (Sec. 940.05, Stats.)

Manslaughter in this state has been defined to mean:

" 'That which will constitute the "heat of passion" which will reduce what would otherwise be murder to manslaughter "is such mental disturbance, caused by reasonable, adequate provocation, as would ordinarily so overcome and dominate or suspend the exercise of the judgment of an ordinary man as to render his mind for the time being deaf to the voice of reason; make him incapable of forming and executing that distinct intent to take human life essential to murder in the first degree; and to cause him, uncontrollably, to act from impelling force of the disturbing cause rather than from any real wickedness of heart or cruelty or recklessness of disposition. . . ." ' " *Weston v. State* (1965), 28 Wis. 2d 136, 144, 135 N. W. 2d 820.

The test in this state as to the issue here raised is: Would the evidence, in one reasonable view, suffice to prove guilt of the higher degree beyond a reasonable doubt, and, under a different, but reasonable view, suffice to prove guilt of the lower degree beyond a reasonable doubt but leave a reasonable doubt as to some element included in the higher degree but not in the lower? [1]

The case relied upon is *State v. Hoyt.*[2] Defendant claims that, under a reasonable view of the evidence, the record here would prove guilt of manslaughter, but leave a reasonable doubt as to murder in the first or second degree, and cites the *Hoyt case* as authority for so claiming.

In a carefully prepared and persuasively argued appeal, defendant's counsel points to similarities between the facts here and the fact situation presented in *Hoyt;* and similarities there are. However, the majority of this court finds dissimilarities in the degree of provocation, as well as in the events immediately preceding the fatal shooting.

*Hoyt* stands for the proposition that actions over a long period of time can have ". . . cumulative effect upon any ordinary person so that the provocation just before the shooting would be greatly magnified."[3] In *Hoyt* there was evidence that would, in any reasonable view, establish the wife had been subjected to a series of physical abuses and maltreatment by her husband. Added to her public humiliation by him within an hour of the killing, plus further insults and physical abuse, this court found a jury question presented as to whether the fatal shooting constituted manslaughter, not murder.

Here the deceased, who was dating defendant's daughter, was invited to live in the defendant's home in January, 1967, and lived there until late March, 1967.

[1] *State v. Bergenthal* (1970), 47 Wis. 2d 668, 674, 178 N. W. 2d 16, 20; *Zenou v. State* (1958), 4 Wis. 2d 655, 668, 91 N. W. 2d 208.
[2] (1964), 21 Wis. 2d 284, 124 N. W. 2d 47, 128 N. W. 2d 645.
[3] *Id.* at page 291.

During this time defendant loaned the deceased money and allowed him to use his gasoline credit card. In May, 1967, the defendant commenced civil action to collect moneys owed him by deceased. A default judgment was entered for defendant in July, 1967, vacated in October, 1967, and re-entered in October, 1967. In July, 1967, defendant testified that his wife told him she was having an affair with the deceased; she testified she told him she "had been in love" with the deceased. While the civil action was pending, the defendant and deceased engaged in several telephone conversations, in which the deceased made uncomplimentary comments about defendant and his wife. In September, 1967, defendant testified his wife told him the deceased had called her and told her to "tell the Polack to stop garnisheeing me or I'll sue you and I'll take your house and your car and everything you own." In October, 1967, defendant was informed by his attorney that deceased's attorney held certain letters from defendant's wife that indicated the moneys lent to him were a gift. The wife testified she could not remember what was in the letters. Defendant's attorney assured him that there was no possibility of deceased starting a civil suit against him and showed him a similar statement sent to deceased's attorney. In early November, 1967, defendant went to deceased's place of employment to demand money on the judgment and the return of the wife's letters. Deceased laughed and answered, "We'll see about it." The defendant told deceased "he had better see fast" because the defendant would "come back and see him again if he didn't give them to her." This was the last contact the defendant had with the deceased until the date of the shooting, December 11, 1967.

Here, as in *Hoyt*, we have a series of provocative incidents preceding the day of the actual shooting. However, here, unlike *Hoyt*, there is a break in the nature or basis for the provocations. This is no case of husband

coming home to find his wife in the arms of another man, and exploding in an understandable heat of passion against either or both. While anger and resentment at the home-defiling activities of the deceased might reasonably be expected to continue smoldering, the bringing of the civil lawsuit and demand for return of letters added a new dimension. Telephone conversations and the visit to the place of employment of deceased dealt with the collection of money loaned and the return of the letters. Anger and resentment at the refusal of deceased to pay the money due on the judgment and return the letters here existed, but hardly the type of anger or resentment that would drive a reasonable person to contemplate or resort to killing, or even threaten killing as a means of securing collection. The distinction concededly is one of degree only, but it is with matters of degree that this case deals.

However, it is in the events of the day of the killing that this case is most sharply distinguishable from *Hoyt*. In *Hoyt,* the wife testified she and her husband arrived home from a tavern where her husband had publicly humiliated her. She attempted to talk with him only to be insulted and forcefully shoved away. She testified that, without thinking, she reached for a gun kept in the bedroom and walked toward the deceased. She testified he again insulted her and dared her to shoot. After the shooting, she drove to the home of her parents and they testified she appeared to be in a state of shock at the time.

Here, on the day of the shooting, December 11, 1967, the defendant testified he left his home at approximately 7:30–7:45 in the morning. He took with him a loaded 7.65 mm. automatic revolver. He testified he was well acquainted with the weapon as he frequently used it in target practice. On direct examination, the defendant testified that to fire the gun a shell had to be put into the chamber and that this could be done only by

cocking the revolver and thereby pulling a cartridge up into the firing chamber. The defendant testified he cocked the gun before he left the house in the morning.

The defendant testified he proceeded to his place of employment that morning, but, after checking in, told his supervisor he had to "see a fellow about trying to collect some money." He went directly to the parking garage where deceased was employed. Once at the garage, defendant testified he asked the deceased for the letters and money owed him. The deceased allegedly responded, "I wouldn't give that slut a damn thing." Defendant testified he then ". . . pulled the gun out, I think I pointed it at his head, and I kept firing until the gun wouldn't fire any more." The sole eyewitness, an employee of the parking garage, Rachel Bublitz, testified she heard no conversation but observed a person, unknown at the time to her, approach the defendant from the rear, point a gun about 12 inches from deceased's head and fire six shots. Defendant testified he then left the garage, drove to the police headquarters in the Safety Building and turned himself in. The two police officers who questioned him testified he appeared relatively calm, showed little emotion, was very cooperative, said he had explained the money problem but the deceased laughed at him, so he shot him.

Do these events of the day of the killing by a reasonable view of the evidence establish "reasonable, adequate provocation" so as to make the defendant "incapable of forming and executing that distinct intent" so as to require the submission of a manslaughter verdict? We think not. It is true the defendant testified he took the gun along only for the purpose of scaring the deceased, but he would not have had to carry it loaded or cock it for immediate firing to accomplish such purpose. In civil cases physical evidence must control where it is in clear conflict with the oral testimony,[4]

---

[4] *Strnad v. Co-operative Ins. Mut.* (1949), 256 Wis. 261, 271, 40 N. W. 2d 552.

and ". . . the same rule applies in criminal actions in determining whether there is any reasonable basis in the evidence for submitting lower degrees of homicide." [5]

It is clear the testimony here supports the jury's verdict that the shooting of deceased by defendant was done with intent to kill. More to the point of this single-issue appeal, that testimony by failing to negate the intentional nature of the shooting supports the trial court's refusal to submit manslaughter to the jury as an alternative verdict.

*By the Court.*—Order affirmed.

---

[5] *Brook v. State* (1963), 21 Wis. 2d 32, 44, 123 N. W. 2d 535.