CHART, by Richard E. Sommer, her Guardian ad Litem, and another, Plaintiffs-Respondents, v. GENERAL MOTORS CORPORATION, Defendant-Appellant: RICHARD L. GUTMANN, and another, Defendants: LEO J. GUTMANN, Third-Party Defendant.†

CHART, by Richard E. Sommer, her Guardian ad Litem, and another, Plaintiffs-Respondents, v. DVORAK, and another, Defendants.†

*No. 75–168. Argued May 4, 1977.—Decided October 4, 1977.*
(Also reported in 258 N. W. 2d 680.)

† Motion for rehearing denied, with costs, on January 3, 1978.

92

94

96

For the appellant there were briefs by *Foley & Lardner* of Milwaukee; *Tinkham, Smith, Bliss, Patterson & Richards* of Wausau; and *Frazier F. Hilder*, General Counsel's Office, General Motors Corporation, of Detroit, and oral argument by *David E. Beckwith* of Milwaukee.

For the respondents there were briefs by *Curtis M. Kirkhuff* of Madison, and *Richard E. Sommer* of Rhinelander, and oral argument by *Messrs. Kirkhuff* and *Sommer.*

DAY, J.    On the night of July 30, 1966 in the town of St. Germain, Wisconsin, Penny Chart, the principal respondent and plaintiff below, was severely injured when the 1963 Corvair Spyder Monza convertible in which she was a passenger went out of control, hitting a telephone pole, spinning, and then hitting a highway sign before coming to rest.    In this action for personal injuries, a jury found defendant General Motors Corporation twelve percent negligent for plaintiff's injuries and the court granted judgment accordingly.    General Motors appeals.[1]

On the evening of July 30, 1966, Penny Chart (hereinafter plaintiff) and three friends, Angela Quartullo, Renn Karl and Richard Gutmann traveled to a beer bar. The route traveled was through the intersection of state highway 70 and 155.    The bar was approximately four miles west of this intersection.    It was at this intersection

[1] Co-plaintiff was Bernice Chart, Penny's mother. Other defendants below against whom verdicts were returned did not appeal: Richard Gutmann, the driver; his father Leo J. Gutmann, owner of the car in question, and Vilas County, which was dismissed as a party on the basis of a Pierringer-type release. In a consolidated action, tried simultaneously, *Chart v. Dvorak*, the court granted judgment notwithstanding the verdict in favor of Carl J. Dvorak and M. A. Varekois, two state employees. The plaintiffs seek to have that portion of the judgment examined by notice of review, filed pursuant to sec. 274.12 (1), Stats.

that the accident occurred on the return trip from the bar. During the evening the couples danced and Karl and Gutmann drank beer. At about 11:00 p.m. these four persons and two others, Margaret Beaton and Janet Peterson left in the Gutmann car to go another bar. Plaintiff sat in the right front seat and did not use her seat belt. Richard Gutmann drove.

The vehicle left the bar parking lot at a rate of speed which caused gravel to fly. After heading east on state highway 70, Gutmann accelerated to a rate of speed which exceeded the legal night speed of 55 m.p.h. Plaintiff, Quartullo and Beaton all protested asking Gutmann at various points to slow down.

At the intersection of state highways 70 and 155 a driver travelling in the direction of the Gutmann automobile who would wish to remain on highway 70 must make a ninety-degree turn to the right. As the Gutmann vehicle approached this intersection, plaintiff warned Gutmann of the sharp curve ahead to the right. The initial warning was given about one-half mile before the intersection. As the car neared the intersection, plaintiff reiterated her previous warning, stating, "This is the corner. Slow down."

At trial, Gutmann acknowledged receiving these warnings. There was testimony that he ignored these warnings and did not slow down until approximately 200 feet from the curve. At that point he applied the brakes and began to turn the car to the right in order to make the curve. Gutmann failed to negotiate the curve and the Corvair struck a telephone pole and a signpost. As a result plaintiff was ejected from the automobile and struck the ground.

Plaintiff brought suit against driver Gutmann for negligence, General Motors for defective design of the car, Vilas County for negligent maintenance of the intersection and two state highway employees for negligent placement of a highway warning sign.

Plaintiffs' theory against General Motors, established through expert testimony, was that the 1963 rear engine Corvair had a defective rear suspension system. It was alleged the automobile's swing axle type suspension possessed certain inherent disadvantages which prevented this type of suspension from being widely accepted in the manufacture of automobiles in this country. In particular, it was alleged that the swing axle, under severe lateral forces produced by cornering, tended to lift the rear end of the vehicle. This in turn caused the rear tires to bend causing "oversteer." In an oversteer vehicle, the natural character of the vehicle in a turn is to cut a curve sharper and to follow a radius which would be tighter than the intended path. This type of steering characteristic was alleged to be foreign and unfamiliar to the average American driver. These characteristics of the automobile allegedly caused the back end of the automobile to go out of control during the cornering maneuver at the accident intersection.

A six week trial commencing September 9, 1974 culminated in a verdict for Penelope Chart in the amount of $777,674 and a verdict in favor of her mother in the amount of $34,917. Liability was apportioned at seventy-five percent to the driver Gutmann; twelve percent to General Motors, five percent to Vilas County; five percent to state employees Dvorak and Varekois and three percent to plaintiff Penelope Chart.

After verdict the trial court granted judgment notwithstanding the verdict in favor of defendants Varekois and Dvorak. The court also reduced damages by five percent to reflect a release that the plaintiffs had given to Vilas County prior to trial.

The trial court admitted over strenuous objection by counsel for General Motors evidence relating to subsequent changes in the design of the 1964 and 1965 Corvair suspension systems.

Rule 904.07, Stats., entitled *Subsequent remedial measures* provides in part:

"When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This section does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving . . . feasibility of precautionary measures, if controverted. . . ."

General Motors argues this section excludes evidence of design change in the instant case. The question has not been decided in this state. The Judicial Council note following the above cited rule says:[2]

"The rule does not attempt to make the determination whether remedial measures in product design are admissible as 'feasibility of a precautionary measure' to prove that the product was defective. The authorities are in conflict. See 1 Frumer, *Products Liability,* sec. 12.04 at 337 (1964)."

Authorities are divided on the question whether evidence of subsequent remedial changes is admissible in a products liability case such as this. We are persuaded that such evidence is admissible. Evidence of subsequent remedial measures is not without probative value. In the well-reasoned and persuasive opinion of *Ault v. International Harvester Co.,* 13 Cal.3d 113, 117 Cal. Rptr. 812, 528 P.2d 1148 (1974), the California Supreme Court stated, "if the changes occur closely in time they may well illustrate the feasibility of the improvement at the time of the accident, one of the normal elements in the negligence calculus."[3]

---

[2] 59 Wis.2d Rp. 88–89.

[3] 528 P.2d at 1151.

Although the evidence may be relevant, nevertheless the underlying policy of sec. 904.07, Stats. is to exclude such evidence so as not to deter a potential or present defendant from taking steps that will promote safety but at the same time tend to be inculpatory. However, the case of *Sutkowski v. Universal Marion Corporation*, 5 Ill. App.3d 313, 281 N.E.2d 749 (1972), notes that in the products liability area, "policy considerations are involved which shift the emphasis from the defendant manufacturers' conduct to the character of the product." With this change in emphasis, admission of evidence of subsequent conduct poses little threat to the social policy embodied in sec. 904.07, Stats.

On this point the California Supreme Court wrote,

"When the context is transformed from a typical negligence setting to the modern products liability field, however, the 'public policy' assumptions justifying this evidentiary rule are no longer valid. The contemporary corporate mass producer of goods, the normal products liability defendant, manufactures tens of thousands of units of goods; it is manifestly unrealistic to suggest that such a producer will forego making improvements in its product, and risk innumerable additional lawsuits and the attendant adverse effect upon its public image, simply because evidence of adoption of such improvement may be admitted in an action founded on strict liability for recovery on an injury that preceded the improvement. In the products liability area, the exclusionary rule . . . does not affect the primary conduct of the mass producer of goods, but serves merely as a shield against potential liability. In short, the purpose of section 1151 is not applicable to a strict liability case and hence its exclusionary rule should not be gratuitously extended to that field." *Ault, supra*, 528 P.2d at 1151. *See also*, Note, *Products Liability and Evidence of Subsequent Repairs*, 1972 Duke L. J. 837, 845–852.

We agree that the conduct of a manufacturer of a mass-produced product will not be guided by the evidentiary

rule we make here. Economic realities will set the course and these realities are that the sooner remedial measures are taken, the less costly the defect will be to the manufacturer.

Many car manufacturers "recall" particular models for correction of defects discovered after large numbers have been purchased by consumers so that hazards may be eliminated. This very commendable practice is usually accompanied by a great deal of media publicity to advise and encourage car owners to turn the cars in for correction. Part of the purpose of such public recall is to reduce the possibility of injury to drivers and passengers and possible liability for such injuries. We have read but are not persuaded by contrary authority cited by General Motors.[4] The trial court did not err in admitting this evidence.

General Motors also complains the trial court erred in excluding evidence that the Corvair automobile had limits of control at least as good or better than other American cars produced at the same time. The offered evidence concerned the measure of gravitational force at which the Corvair loses control compared to other cars.

This court has held that a trial court has considerable discretion in determining whether an offered item of evidence is relevant to the issues in the case. In *City of Franklin v. Badger Ford Truck Sales,* 58 Wis.2d 641, 656, 657, 207 N.W.2d 866 (1973) we said,

"Evidence that like products were free from, or were subject to, defective or injurious condition is generally

---

[4] *See: Cox v. General Electric,* 302 F.2d 389, 390 (6th Cir. 1962); *Price v. Buckingham Manufacturing Co.,* 110 N.J. Super 462, 266 A.2d 140, 141 (1970); *Smyth v. Upjohn Co.,* 529 F.2d 803, 804 (2d Cir. 1975).

admissible. But considerable discretion is 'necessarily vested' in trial judges on the question of whether introduction of such evidence would involve undue distraction, undue consumption of time or undue introduction of entirely collateral issues."[5]

We have examined the record and conclude that General Motors was given ample opportunity to compare the Corvair to other automobiles. For example, Archie D. Easton, an expert called by General Motors, testified that the 1963 Corvair handled comparatively well relative to those cars in its class. Cars in its class were identified as Falcon, Valiant and Volkswagen. Easton also stated the Corvair handled as well as a 1963 Oldsmobile Cutlass convertible and that under adverse or slippery conditions, it was more stable than front engine vehicles such as Plymouth, Ford or Chevrolet.

The excluded evidence concerning limits of control was at best of limited probative value because the point of comparison which was relevant to plaintiff's theory of liability was not the limits of control, but rather, the handling characteristics of the automobile once that limit was reached. The quantitative comparison offered by General Motors did not account for the difference in handling of understeer and oversteer vehicles. Corvair, unlike other American cars, had the oversteer characteristic allegedly the cause of the accident. We thus hold

[5] Citing *Netzel v. State Sand & Gravel Co.*, 51 Wis.2d 1, 9, 186 N.W.2d 258 (1971). *Accord, Lemberger v. Koehring Co.*, 63 Wis.2d 210, 226, 216 N.W.2d 542 (1974) (Trial court properly exercised discretion in excluding photographic evidence which may well have resulted in jury confusion). *See also, Rausch v. Buisse*, 33 Wis.2d 154, 167, 146 N.W.2d 801 (1966): Annot., *Admissibility, in action against manufacturer . . . of evidence that like products were free from, or were subject to, defective or injurious conditions*, 127 A.L.R. 1194 (1940).

General Motors was not prejudiced by the evidentiary ruling of the trial court.

Turning from evidentiary rulings to the jury charge, General Motors contends the trial court erred by giving the emergency instruction to the jury on behalf of defendant Richard Gutmann.[6]

This court has established a three-prong test for determining whether the emergency instruction should be given:

"'(1) The party seeking its benefits must be free from the negligence which contributed to the creation of the emergency; (2) the time element in which action is required must be short enough to preclude the deliberate and intelligent choice of action; and (3) the element of negligence inquired into must concern management and control.'" *Jankowski v. A. O. Smith Corp.*, 62 Wis.2d 440, 443, 215 N.W.2d 447 (1974); *Menge v. State Farm Mut. Automobile Ins. Co.*, 41 Wis.2d 578, 582, 583, 164 N.W.2d 495 (1969); *Edeler v. O'Brien*, 38 Wis.2d 691, 697, 698, 158 N.W.2d 301 (1968).

It is beyond serious dispute that there is overwhelming evidence in the record that driver Gutmann was negli-

---

[6] Wis J I—Civil, 1015 provides: "*Negligence In An Emergency.*

"Drivers of motor vehicles who are suddenly confronted by an emergency, not brought about or contributed to by their own negligence, and who are compelled to act instantly to avoid collision or injury, are not guilty of negligence if they make such choice of action or inaction as an ordinarily prudent person might make if placed in the same position, even though it should afterwards appear not to have been the best or safest course. You will bear in mind, however, that the rule just stated does not apply to any person whose negligence wholly or in part created the emergency. One is not entitled to the benefit of the emergency rule unless he is without fault in the creation of the emergency.

"You will bear in mind that this instruction on the emergency rule is to be applied only in regard to the inquiry of negligence as to management and control."

gent as to management and control of his vehicle. But Gutmann did testify that he was not speeding, that he did not see a sign warning of the curve ahead, and that he heeded Penny Chart's warning by slowing down sufficiently in advance of the curve. This testimony was highly improbable, but it was not incredible as a matter of law. The trial court took the prudent course and put the issue of whether Gutmann's negligence was a factor in producing the emergency to the jury. This was proper. *Geis v. Hirth,* 32 Wis.2d 580, 587, 146 N.W.2d 459 (1966). *Cf. Hoeft v. Friedel,* 70 Wis.2d 1022, 1030, 235 N.W.2d 918 (1975).

We believe the fact that the jury found Gutmann seventy-five percent causally negligent and General Motors only twelve percent causally negligent is evidence that the jury probably disregarded the emergency instruction; in any event, this allocation in light of other evidence in the record independently establishing General Motors' culpability demonstrates submission of the instruction was not prejudicial.

The test for error in the giving of instructions was stated in *Willenkamp v. Keeshin Transport System, Inc.,* 23 Wis.2d 523, 529, 127 N.W.2d 804 (1964), and reaffirmed in *Menge v. State Farm Mut. Automobile Ins. Co.,* 41 Wis.2d 578, 584, 164 N.W.2d 495 (1969) as follows:

"In determining whether an error in instructions is prejudicial, the instructions must be considered as a whole. . . . In passing on the prejudicial effect of an erroneous instruction the test is not the possibility of the jury's being misled, but the probability thereof." (Citations omitted.)

In *Knox v. American Standard Ins. Co.,* 64 Wis.2d 229, 219 N.W.2d 333 (1974), cited by General Motors, the issue was not whether the instruction was properly

submitted, but rather whether there was credible evidence to sustain the jury verdict. 64 Wis.2d at 230. Consequently, *Knox* does not suggest a contrary result in this case.

The trial court did not err in submitting the emergency instruction. Considering the extensive evidence that the Corvair was defectively designed, the jury could have allocated twelve percent negligence to General Motors in the total absence of the emergency instruction.

General Motors contends there is insufficient evidence to sustain the jury finding that the Corvair was defective, unreasonably dangerous, or a contributing cause of the accident. In reviewing a jury verdict, the test to be applied is whether there was any credible evidence which supported the jury's verdict. *Herro v. Dept. of Natural Resources,* 67 Wis.2d 407, 414, 227 N.W.2d 456 (1975); *Jacobs v. Stack,* 63 Wis.2d 672, 676, 218 N.W.2d 364 (1974). As stated in *Weeden v. Beloit,* 29 Wis.2d 662, 139 N.W.2d 616 (1966): "In reviewing a jury verdict this court need only consider that evidence which supports the verdict."

In the case at bar, the expert testimony was voluminous on both sides. An independent review of the record, including plaintiffs' expert testimony indicates there was sufficient evidence to sustain the jury verdict as to General Motors' liability.

Plaintiffs' experts testified that the 1963 Corvair was unreasonably dangerous and in a defective condition at the time the car left the possession of General Motors.

Plaintiffs' experts Thomas Manos and George Caramanna testified that the problem with the Corvair in question was a defective design of the rear suspension system. They testified that to a reasonable degree of engineering certainty, this defect caused the car to over-

steer in turning maneuvers which was causal in bringing about the injuries sustained by Penny Chart.

Another expert, William Blakely, testified that it was his opinion to a reasonable degree of engineering certainty that the oversteering characteristic of the Corvair ought to have been explained to anyone likely to drive the car. Byron Heurtebise, another expert called by the plaintiff, testified the conception of the rear swing axle configuration and suspension system in the 1963 Corvair was a mistake.

The trial court entered the following findings relating to the testimony of the defect in the design of the car:

"The expert witnesses on both sides, plaintiffs and General Motors, employed terminology which can best be described as arcane. 'Jacking-up,' 'tuck-under,' along with 'oversteer,' were words and phrases used by the experts in giving their respective opinions to the jury that the vehicle was or was not defective. We will not attempt to analyze experts, plaintiffs' or defendants.' Suffice to say that their opinions differed sharply. The jury found that the 1963 Corvair was defective. We cannot say that the answer so made by the jury is against the great weight and clear preponderance of the evidence as to warrant the granting of a new trial."

On appeal on motion after verdict, all that is required to sustain the jury verdict is any credible evidence. General Motors argues that pertinent facts necessary to establish that the car in question was unreasonably dangerous and defective were not established at trial. But the record shows that such facts were established by plaintiffs' qualified experts. We cannot say the jury was not entitled to believe such evidence or that such evidence was incredible as a matter of law.

General Motors points to several comments made by plaintiffs' counsel during closing argument and claims it is for this reason entitled to a new trial. General

Motors objected to certain comments during closing argument but failed to move for a new trial before the jury returned its verdict.

The rationale for requiring a timely motion for a new trial is to prevent counsel from gambling on a jury verdict in its favor before seeking a new trial. As stated in the case of *Basile v. Fath*, 185 Wis. 646, 651, 201 N.W. 247, 202 N.W. 367 (1925) :

". . . [C]ounsel cannot sit in silence while being made the subject of abuse and vituperation by opposing counsel and speculate by their silence on the very reasonable theory that the violence will have a boomerang effect; or rely upon the opportunity thereby offered of either replying in kind or the far more effective method of repaying the adversary by gentleness. . .

"But counsel having remained silent when he could or should have spoken on such a matter so clearly requiring immediate action by the court, ought not to be permitted after verdict against him to try again."

General Motors waived any complaint in this regard. *Nietfeldt v. American Mut. Liability Ins. Co.*, 67 Wis.2d 79, 89, 226 N.W.2d 418 (1975) ; *State v. Cydzik*, 60 Wis. 2d 683, 695, 211 N.W.2d 421 (1973).

General Motors seeks to have the judgment against it reduced in light of the Pierringer-type[7] release executed between the plaintiffs and Vilas County. General Motors complains that the other nonsettling defendants, the Gutmanns, are judgment-proof and that the effect of the release with Vilas County is to bar General Motors' right of contribution against the only other solvent defendant (Vilas County). General Motors asks us to hold that as a consequence, plaintiffs should bear a portion of the un-

---

[7] See, *Pierringer v. Hoger*, 21 Wis.2d 182, 124 N.W.2d 106 (1963).

collectible judgment, in the proportion that the non-settlor's liability (General Motors) bears to the settlor's (Vilas County's) liability.[8]

But this proposal assumes that had Vilas County not executed a release and instead remained in the lawsuit, it would have had to share with General Motors a proportion of the amount that was uncollectible from the judgment-proof Gutmanns. There exists no rule requiring solvent, nonsettling tort-feasors to equitably share that part of a judgment which is uncollectible from an insolvent, nonsettling tort-feasor.[9] We decline to consider such a rule here.

Were we to consider such a rule we would, in this case, have to take a second step: Once it is determined solvent nonsettling tort-feasors must equitably share the burden of the insolvent tort-feasor's liability, we would then be required to hold that where a Pierringer release is executed, the plaintiff steps in the shoes of the settling tort-feasor. To so hold would defeat a plaintiff's motivation for entering into a release. The monetary value of the release to the plaintiff would become contingent on the lawsuit, and thus the certainty and rationality of fixing the rights and liabilities between the settling defendant and plaintiff would be lost. We reject General Motors' argument.

---

[8] General Motors was found twelve percent negligent and Vilas County five percent negligent. General Motors claims it should be liable for twelve-seventeenths of the uncollectible portion of the judgment; plaintiff should bear five-seventeenths.

[9] This court in *Bielski v. Schulze*, 16 Wis.2d 1, 6, 114 N.W.2d 105 (1962), established the rule that joint tort-feasors are liable for contribution in an amount equal to their percentage of negligence. At the same time Bielski made clear that "this refinement of the rule of contribution does not apply to or change the plaintiff's right to recover against any defendant tort-feasor the total amount of his damage to which he is entitled."

The jury determined that state employees Varekois and Dvorak were five percent negligent. The trial court entered judgment for these defendants notwithstanding the verdict.

Dvorak was at all times relevant to this action chief maintenance engineer for district No. 7 of the State Highway Commission, which included Vilas county. His duties included overall responsibility for the district sign shop, for highway marking and signing, and related traffic activities.

Varekois was at all times relevant to this action the district traffic supervisor for district No. 7 of the State Highway Commission. His duties included supervision of the sign shop and the signing and marking operations. He was also responsible for the supervision, installation and maintenance of signs and traffic control devices.

A verdict should only be directed against a plaintiff where plaintiff's evidence is insufficient to sustain a verdict after giving it the most favorable construction it will reasonably bear. *Jacobs v. Stack, supra,* at 676; *Davis v. Skille,* 12 Wis.2d 482, 484, 107 N.W.2d 458 (1961). This standard applies to both the trial court on a motion after verdict and to this court on appeal. *Page v. American Family Mut. Ins. Co.,* 42 Wis.2d 671, 681, 168 N.W.2d 65 (1969).

The theory upon which these defendants were allegedly negligent was that the existence of commercial advertising signs surrounding the warning sign had created a camouflage condition which obstructed Richard Gutmann's view of the warning sign. Plaintiffs claim this condition constituted negligence and noncompliance with the Manual of Uniform Traffic Control Devices for Streets and Highways (hereafter Manual).

Plaintiffs introduced testimony of Harold Vik, who was qualified as an expert on highway design by the plain-

tiffs. Vik testified that he discovered in a 1967 survey conducted by Robert Bandow (a registered land surveyor called by plaintiffs to testify at trial), that there were a multitude of signs along the side of the road in the vicinity of the warning sign and up to the intersection. This was verified by Bandow.

Vik testified that,

"It is my opinion to a reasonable engineering certainty that the predominant signs of advertising in the vicinity of the warning sign would be distracting in the view of the warning sign. I would consider that to be causal with respect to the accident and injuries to Penny Chart."

However Vik also testified that he viewed the scene and the nearby signs only in the daytime. The accident here at issue took place at night. Accordingly, the trial court concluded that "the opinion of the expert, above recited, was and is not worthy of belief, and has no probative value." This trial court conclusion was buttressed by photographs taken at night by Norman Ehlke.

Ehlke was qualified at trial as an expert photographer. He took pictures of the warning sign area on highway 70 on the evening of July 28, 1970. The weather conditions and location of the signs were essentially the same as at the time of the accident. According to Ehlke, the pictures were taken with no lighting other than the headlights from Ehlke's automobile.

We have studied these photographs. The warning sign in question is totally visible and is not obscured or camouflaged by commercial signs. The warning sign, as illuminated by the car headlights, stands out clearly and visibly.

Thus Vik's testimony based on daylight view is in direct conflict with the photographs. This court has stated that physical evidence must control where it is in clear conflict with oral testimony. *State v. Lucynski,*

48 Wis.2d 232, 238, 179 N.W.2d 889 (1970); *Strnad v. Co-operative Insurance Mutual,* 256 Wis. 261, 271, 40 N.W.2d 552 (1949).

In *Burns v. Weyker,* 218 Wis. 363, 261 N.W. 244 (1935), the court drew inferences after viewing photographs of automobiles following an accident and stated:

"From these and other circumstances which appear in the evidence it is considered that the testimony tending to support the plaintiff's case is so contradicted by the established physical facts as to be incredible. . . . Many things might have happened, but that the accident happened on the south side of the highway, and that the truck was in its proper lane over to its right side, is established beyond any reasonable controversy. With that fact established, the testimony that the Weyker car was on its own or right side of the highway is made incredible." *Id.* at 373.

On the basis of these photographs we affirm the trial court's dismissal of the complaint and cross-complaint against defendants Varekois and Dvorak.

Another problem concerns the posture in which the lawsuit was left after the judgment was granted.

Rather than granting a new trial, the trial court took the five percent negligence of the defendants Varekois and Dvorak and reapportioned it among the remaining defendants in proportion to the percentage of negligence which they were originally adjudged. In this way the trial court hoped to avoid the necessity of a full retrial, employing the rationale that the jury had already spoken as to relative percentages of the remaining defendants.

This reapportionment, though equitable perhaps in an abstract sense, nevertheless represents a speculative result on the part of the court, and we have declared the practice to be improper. *Nelson v. L. & J. Press Corp.,* 65 Wis.2d 770, 783, 223 N.W.2d 607 (1974); *Vroman v. Kempke,* 34 Wis.2d 680, 685, 150 N.W.2d 423 (1967).

We are nevertheless cognizant of the difficulty fore-closing this option to the trial court presents. We have repeatedly advised trial courts that the better practice on a motion for a directed verdict at the close of evidence is to reserve the ruling and submit the matter to the jury. *Eg., Samson v. Riesing,* 62 Wis.2d 698, 704, 215 N.W.2d 662 (1973); *Flintrop v. Lefco,* 52 Wis.2d 244, 251, 190 N.W.2d 140 (1971). But in reserving the ruling until after the verdict, the inability to reapportion the jury's verdict means that the trial court can exercise its prerogative to grant judgment n.o.v. in the case of multiple tort-feasors only at the price of ordering a new trial.

The accident in this case occurred eleven years ago; the trial represented a massive undertaking on the part of all concerned. Defendant General Motors did not appeal that portion of the judgment declaring Varekois and Dvorak not negligent. Subsequently, when that portion of the judgment was brought before the court pursuant to notice of review filed by plaintiffs, sec. 274.12 (1), Stats., General Motors took the position that the judgment as to Dvorak and Varekois should be affirmed. We agree with General Motors as to the non-liability of Varekois and Dvorak.

We hold under the facts and circumstances of this case, where reallocation of this small percentage of negligence affects damages but not liability, that plaintiffs should be given the option of a reduction of the judgment by five percent or a new trial. The defendant, General Motors, electing not to appeal this portion of the judgment dismissing Varekois and Dvorak, is not a party aggrieved if the plaintiffs elect to absorb this five percent by having the judgment reduced by that amount. General Motors is in no different position than it would be if the plaintiff had given a "Pierringer"

release to Varekois and Dvorak and then later their negligence was found to be five percent. The plaintiff would be required under such situation to have the judgment reduced by five percent.

*By the Court.*—Judgment in favor of Bernice and Penelope Chart is modified to eliminate the reapportionment of the five percent negligence of defendants Varekois and Dvorak among the parties. The total judgment is hereby reduced by five percent, unless within twenty days from the date of remittitur plaintiffs shall file with the clerk of this court a written notice that they elect to have a new trial. If a new trial is timely elected, the judgment will be reversed. Otherwise the judgment is affirmed as modified.

The judgment in favor of Carl J. Dvorak and M. A. Varekois is affirmed.

CONNOR T. HANSEN, J. (*dissenting*). I respectfully dissent. I believe the majority misconceives the nature of a manufacturer's duty under the theory of products liability. In my opinion, the result reached by the majority, for all practical purposes, makes the manufacturer an absolute insurer.

This court has adopted the principle of strict liability set forth in section 402A of the Restatement, 2 *Torts* 2d 347, 348.[1] That principle applies to any product which

---

[1] That section provides:

"*402A. Special Liability of Seller of Product for Physical Harm to User or Consumer*

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

is in a "defective condition" and "unreasonably dangerous" to the user. From one or both of these requirements there arises a fundamental limitation upon the liability of a manufacturer. This qualification was recognized in Comment *h* to section 402A, p. 351, which reads in part:

"*h.* A product is not in a defective condition when it is safe for normal handling and consumption. If the injury results from abnormal handling, as where a bottled beverage is knocked against a radiator to remove the cap, . . . the seller is not liable. . . ."

In other words, a manufacturer is generally required to provide a product which is safe for its normal or intended uses. Where the manufacturer has reason to foresee danger from an abnormal use, he may have the additional duty to give adequate warning of the danger. Comment *h, supra.*

This further duty to warn does not extend to patent dangers, however. As we said in *Vincer v. Esther Wms. All-Alum. S. Pool Co.,* 69 Wis.2d 326, 332, 230 N.W.2d 794 (1975):

". . . If the average consumer would reasonably anticipate the dangerous condition of the product and fully appreciate the attendant risk of injury, it would not be unreasonably dangerous and defective. . . ."

Thus it would be superfluous to require a general warning of danger on a sharp knife, *Note, Foreseeability In Product Design And Duty To Warn Cases—Distinctions And Misconceptions,* 1968 Wis. L. Rev. 228, 235, and the manufacturer of a Volkswagen is under no duty to warn a consumer that the size of a "beetle" renders it less safe in an accident than a larger car. *See: Arbet v. Gussarson,* 66 Wis.2d 551, 557, 225 N.W.2d 431 (1975).

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

For the manufacturer to have a duty, either to make the product more safe or to warn of its hazards, ". . . The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics. . . ." *See:* Restatement 2 *Torts* 2d, sec. 402A, Comment *i,* p. 352. In sum, then, a manufacturer's duty is to provide a product which is not defective or unreasonably dangerous for its intended or normal use, and to warn of foreseeable hazards in any other anticipated uses, if the hazards are not apparent.

Applying these principles to the instant case, it is clear to me that General Motors is not liable for the plaintiff's injuries. It could not be seriously contended that the accident occurred while the Corvair was being used in the normal or intended manner, and the hazard implicit in reckless misuse was plain to all.

The driver, Gutmann, gained entry to the Bronco Beer Bar with a false identification card. There he had from four to six beers, "chugalugging" four glasses just before leaving. He had quarreled with his girl friend, Ms. Quartullo, and was angry when they left. In the parking lot, he nearly backed into Ms. Beaton and tossed his beer bottle out the window. As the car left the tavern, gravel flew, the tires squealed, and the car "fishtailed."

As they sped down the highway, various passengers pleaded with Gutmann to slow down; asked to be let out of the car; and urged Gutmann to consider the safety of the others. Penny Chart warned him twice that they were nearing the intersection and instructed him to slow down. The intersection was marked by a warning sign with a posted speed of twenty miles per hour. Passenger Renn Karl observed shortly before they reached the intersection that the speedometer indicated a speed in excess of seventy miles per hour.

Karl estimated that Gutmann's speed remained near seventy miles per hour until the car was two hundred feet from the intersection. Even plaintiffs' experts put Gutmann's speed at forty to fifty-five miles per hour. General Motors demonstrated that a comparable Corvair could negotiate the corner at thirty-five miles per hour.

On this evidence it cannot be contended that Gutmann's attempted negotiation of the curve was within the normal or intended use of the auto, or that the manufacturer must warn that such misuse is dangerous. While a manufacturer can foresee that some drivers will attempt maneuvers at excessive speeds, just as it can foresee that some cars will be employed in drag races or high-speed getaways, the danger of such misuse is fully apparent to the driver.

The trial court refused to admit evidence that the Corvair had limits of control equal to or better than other American cars, and the majority upholds this decision. The court recognizes that such evidence is generally admissible, although it may be excluded in the discretion of the trial court where the evidence would involve undue distraction, undue consumption of time, or entirely collateral issues. *City of Franklin v. Badger Ford Truck Sales,* 58 Wis.2d 641, 656, 657, 207 N.W.2d 866 (1973). None of these dangers existed in the present case. Concern for consumption of time carries little weight in a six-week trial. Most important, the issue was not collateral or a distraction; it was the heart of the case. The evidence should therefore have been admitted.

In upholding the trial court's decision, the majority says that:

". . . the point of comparison which was relevant to plaintiff's theory of liability was not the limits of control, but rather, the handling characteristics of the automobile once that limit was reached."

This seriously muddies an already confused area of the law. The relevant question was not how well a Corvair compares with other cars when recklessly thrown into an uncontrollable skid or spin. The question was whether the car was safe for its normal and intended uses and whether it had any nonapparent feature which made it dangerous in some other foreseeable use which, but for the defect, would have been harmless.

Many, if not most, products have "limits of control," or performance or tolerance. Beyond those limits, the product may become dangerous. What happens beyond the product's limits is irrelevant, however, where those limits are sufficiently high that the product is safe for its intended uses, and where the danger of a use which ignores those limits is manifest.

By the majority's reasoning, the pertinent factor is what happens to a product when it is overloaded, misused or tampered with. An elevator might be perfectly safe under any reasonable load; by the court's reasoning, the manufacturer could still be held liable if the elevator had poor "handling characteristics" when recklessly overloaded. Under sufficient pressure, a tire will burst. If a grossly overinflated tire exploded, the majority's test would not ask whether the overinflation was reasonable or involved a patent danger, but would ask only whether this brand of tire exploded more dangerously than did other brands. I believe this approach is misguided.

A manufacturer is under no duty to make an automobile or any other product accident-proof or foolproof; nor must he render it "more" safe where the danger to be avoided is obvious to all. *Evans v. General Motors Corp.* (7th Cir. 1966), 359 Fed.2d 822, 824. An auto manufacturer knows that its vehicles will occasionally be driven into bodies of water, but it has no duty to equip them with pontoons, or to inform owners that the vehicles do not float. *Evans v. General Motors Corp., supra,* 825.

For the same reasons, vehicles need not be designed to be driven on racetracks, over cliffs, or, I submit, around corners at two, three or four times the posted speed.

The plaintiff does not assert that the driver could not negotiate a posted twenty mile per hour curve at twenty miles per hour because of the design of the automobile. The manufacturer had a duty to test its automobile only to ensure that it was reasonably safe for its intended purpose, and this intended purpose was not to safely execute curves at speeds in excess of twice the posted speed limit. The manufacturer is simply not under a duty to render the vehicle more safe when the danger to be avoided is obvious to all.

The Supreme Court of Connecticut recently considered a product liability action brought by a driver against a tire manufacturer after the driver failed to negotiate a sharp highway curve. Recovery was held to be precluded by the driver's contributory negligence in traveling into the curve at a speed between seventy and eighty miles per hour, where the speed limit was fifty-five miles per hour. The court said:

". . . A manufacturer or seller is entitled to expect a normal use of his product and we see no good reason why the doctrine of strict liability in tort [sec. 402A Restatement, 2 *Torts*2d] should be extended to negate that expectation. . . ." *Hoelter v. Mohawk Service, Inc.*, 170 Conn. 495, 365 Atl.2d 1064, 1069 (1976).

The court approved the trial court's jury instructions which provided in part that the plaintiff-driver:

". . . 'had the duty not to misuse the studded tires or to use them in an abnormal way. He had the duty of using the tires in a way that a reasonably prudent person, under all the circumstances such [sic] he knew, would use the tires by driving at a reasonable speed under the circumstances and by keeping the car under reasonable control.' . . ." *Hoelter v. Mohawk Service, Inc., supra,* 1070.

Although *Hoelter v. Mohawk Service, Inc., supra,* was decided under the contributory negligence doctrine, I believe the rationale of this decision is sound and applicable to the instant case. Auto manufacturers should not be made absolute insurers against misuse of their products, nor penalized for failure to devise a car which is so crashproof as to be "safe at any speed."

Two other aspects of the majority opinion are disturbing. The first is the approval of the admission of evidence of subsequent design changes in product liability cases. It is not clear how the majority has surmounted the provision of Rule 904.07, Stats., that such evidence is admissible to prove "feasibility of precautionary measures *if controverted, . . .*" (Emphasis added.) The manufacturer did not dispute the technological feasibility of alternative suspension systems.

The majority relies in part on *Sutkowski v. Universal Marion Corp.,* 5 Ill. App.3d 313, 281 N.E.2d 749 (1972). That decision holds design change evidence admissible as proof of feasibility of alternative designs. In Wisconsin, under Rule 904.07, Stats., evidence of feasibility is admissible only when the issue is controverted. If a defendant admits the feasibility of precautionary measures or alternative designs, evidence of subsequent changes is inadmissible. *See:* 1 Frumer and Friedman, *Products Liability,* sec. 12.04, pp. 365, 373.

The majority rests its holding principally on the reasoning of the California Supreme Court in *Ault v. International Harvester Co.,* 13 Cal.3d 113, 117 Cal. Rptr. 812, 528 Pac.2d 1148 (1974), to the effect that evidence of design changes may safely be admitted because admissibility will not deter manufacturers from making design improvements. The California approach to strict liability is far different from that of this court, however. California has entirely abandoned the "unreasonable danger" element of such actions, to avoid any vestige of traditional negligence or "reasonable man" concepts.

See: *Cronin v. J. B. E. Olson Corp.*, 8 Cal.3d 121, 104 Cal. Rptr. 433, 501 Pac.2d 1153 (1972), discussed in *Vincer v. Esther Wms. All-Alum. S. Pool Co.*, *supra*, 334, 335 (WILKIE, C. J. *dissenting*).

Because we have retained the unreasonable danger requirement, the policy calculation here is different. Admissibility of evidence of design changes would have little deterrent effect in California, where the manufacturer will be liable even if the danger was "reasonable." In Wisconsin, design modifications may be decisive on the essential element of unreasonable danger, and may mean the difference between liability and no liability. The deterrent effect of admissibility may therefore be substantial.

The majority concludes that the manufacturer's potential liability for continued production of defective products will compel him to make design changes, even though, by making the changes, he increases the probability that he will be held liable for injuries caused by those products already on the market. I do not know how the majority makes this calculation. I am not convinced that admissibility will not tend to discourage improvements.

Finally, the majority states that "Gutmann did testify that he was not speeding." I do not understand this to refer to Gutmann's testimony that he entered the curve at a speed in excess of forty miles per hour.

The opinion of the court should not be construed as an oblique endorsement of plaintiffs' contention that the posted speed of twenty miles per hour was merely "advisory." It is difficult for me to believe that the majority intends to hold that the legal rate of speed on such a corner is not twenty but rather fifty-five miles per hour. I am not prepared to accept such a contention.

I would reverse and remand for a new trial. I am authorized to state that Mr. Justice HANLEY and Mr. Justice ROBERT W. HANSEN join in this dissent.