STATE of Wisconsin, Plaintiff-Respondent,

v.

Scott E. SCHMIDT, Defendant-Appellant.†

Court of Appeals

*No. 2011AP1903–CR. Submitted on briefs May 22, 2012.
—Decided September 5, 2012.*

2012 WI App 113

(Also reported in 824 N.W.2d 839.)

† Petition for Review filed 10-5-12.

337

338

339

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Donna L. Hintze*, assistant state public defender of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Marguerite M. Moeller*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

Before Hoover, P.J., Peterson and Mangerson, JJ.

¶ 1. HOOVER, P.J.   Scott Schmidt appeals a judgment of conviction for first-degree intentional homicide and an order denying postconviction relief.[1] Schmidt argues he was denied his right to present a defense when the trial court ruled before trial that Schmidt could not present any evidence in support of an adequate provocation mitigation defense. Alternatively, Schmidt argues the court deprived him of his right to counsel during an *in camera* hearing where Schmidt testified in support of his mitigation defense. We conclude Schmidt's proffered evidence was inadequate to raise a provocation issue, as a matter of law. We also reject Schmidt's right-to-counsel argument. We therefore affirm.

## BACKGROUND

¶ 2.   Schmidt shot and killed his estranged wife Kelly Wing-Schmidt on Friday, April 17, 2009. Schmidt fired multiple rounds from his .22 caliber revolver, striking Wing-Schmidt three times in the head, twice in the left hand, and twice in the right arm.

---

[1] Schmidt was also convicted of first-degree recklessly endangering safety and felony bail jumping. He does not appeal those convictions.

340

¶ 3. The State charged Schmidt with first-degree intentional homicide. Prior to his trial, Schmidt moved to introduce other acts evidence in support of an adequate provocation defense. Schmidt asserted the provocative acts consisted of "false allegations, controlling behaviors, threats, isolation, unfaithfulness, verbal abuse and arguments." The State responded that the motion lacked specificity regarding the identity of the witnesses, a summary of their testimony, or the specific items of evidence the defense wanted to introduce to establish adequate provocation.

¶ 4. Schmidt ultimately replied by submitting two documents. The first was an offer of proof listing twenty-nine potential witnesses, along with a brief synopsis of their testimony. The second document included a legal analysis of the adequate provocation defense and an offer of proof with a timeline of events from 2004 to the day of the shooting. The trial court later heard Schmidt testify *in camera*. Following the *in camera* testimony, the court denied Schmidt's motion to introduce evidence in support of an adequate provocation defense.

¶ 5. The case proceeded to trial with the defense acknowledging in its opening statement that Schmidt shot and killed Wing-Schmidt, but contending he did not act with an intent to kill. The jury found Schmidt guilty. In a postconviction motion, Schmidt argued that he was denied his right to present a defense when the court excluded all adequate provocation evidence and that he was denied his right to counsel at the *in camera* hearing. The court denied the motion, and Schmidt appeals.

## DISCUSSION

*Adequate Provocation Defense*

■

¶ 6. Schmidt argues he was entitled to present evidence to the jury in support of an adequate provocation defense. Adequate provocation is an affirmative defense to first-degree intentional homicide that mitigates the offense to second-degree intentional homicide. WIS. STAT. § 940.01(2)(a).[2] The defense applies if "[d]eath was caused under the influence of adequate provocation as defined in s. 939.44." *Id.* Adequate provocation is defined as follows:

> (a) "Adequate" means sufficient to cause complete lack of self-control in an ordinarily constituted person.
>
> (b) "Provocation" means something which the defendant reasonably believes the intended victim has done which causes the defendant to lack self-control completely at the time of causing death.

WIS. STAT. § 939.44(1). " 'Complete loss of self-control' is an extreme mental disturbance or emotional state. It is a state in which a person's ability to exercise judgment is overcome to the extent that the person acts uncontrollably. It is the highest degree of anger, rage, or exasperation." WIS JI—CRIMINAL 1012 (2006).[3]

■

¶ 7. Adequate provocation includes both subjective and objective components. *State v. Felton*, 110

---

[2] All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

[3] The jury instruction's definition of complete loss of self-control is adapted from the description of "heat of passion" under prior law. WIS JI—CRIMINAL 1012, cmt. 9 (2006). The law

Wis. 2d 485, 508, 329 N.W.2d 161 (1983). As to the subjective component, the defendant must actually believe the provocation occurred, and the lack of self-control must be caused by the provocation. *See* Wis. Stat. § 939.44(1); *Felton*, 110 Wis. 2d at 508. As to the objective component, the provocation must be such that would cause an ordinary, reasonable person to lack self-control completely, and the defendant's belief that the provocative acts occurred must be reasonable. *See* Wis. Stat. § 939.44(1); *Felton*, 110 Wis. 2d at 508.

■■

¶ 8.   Once a defendant successfully places an affirmative defense in issue, the State is required to disprove the defense beyond a reasonable doubt. *State v. Head*, 2002 WI 99, ¶¶ 106–07, 255 Wis. 2d 194, 648 N.W.2d 413; *see also* Wis. Stat. § 940.01(3). Thus, the lack of the defense becomes an element of the crime. *See* Wis. Stat. § 940.05(1)(a). "To place a mitigating factor in issue, there need be only 'some' evidence supporting the defense." *Head*, 255 Wis. 2d 194, ¶ 112 (citing *Felton*, 110 Wis. 2d at 507). Our supreme court explained:

> "The burden upon the defendant where a heat-of-passion defense is projected is merely the burden of production as opposed to the burden of persuasion. *It is for the accused to come forward with some evidence* in rebuttal of the state's case—evidence sufficient to raise the issue of the provocation defense. The burden of persuasion, of course, always remains upon the state."

*Id.*, ¶ 111 (quoting *Felton*, 110 Wis. 2d at 507).

of homicide in Wisconsin was revised in 1988. 1987 Wis. Act 399; *State v. Head*, 2002 WI 99, ¶ 54, 255 Wis. 2d 194, 648 N.W.2d 413.

¶ 9. When applying the some evidence standard, "the circuit court must determine whether a reasonable construction of the evidence will support the defendant's theory viewed in the most favorable light it will reasonably admit of from the standpoint of the accused." *Id.*, ¶ 113 (quotation marks and citations omitted). "In other words, 'if under any reasonable view of the evidence the jury could have a reasonable doubt as to the nonexistence of the mitigating circumstance, the burden has been met.' " *Id.* (quoting Walter Dickey, David Schultz & James L. Fullin, Jr., THE IMPORTANCE OF CLARITY IN THE LAW OF HOMICIDE: THE WISCONSIN REVISION, 1989 Wis. L. Rev. 1323, 1347).

¶ 10. Schmidt and the State dispute the proper formulation of the test for determining the admissibility of provocation evidence at trial, the scope of evidence that may be considered, and, ultimately, whether the evidence presented here was sufficient to raise an issue of adequate provocation.

A. Test for admissibility

¶ 11. Schmidt first argues that the standard for introducing evidence of adequate provocation at trial is lower than the "some evidence" standard that applies when later determining whether the defendant is entitled to a jury instruction on the defense. This argument arises from the following commentary in *Head*:

> We think that the standard for giving a jury instruction on self-defense may, in some circumstances, be *higher* than the standard for admitting self-defense evidence at trial, because a defendant's claim of self-defense may be so thoroughly discredited by the end of the trial that no reasonable jury could conclude that the state had

not disproved it. In any event, the threshold for admitting evidence at trial is either lower or the same as the threshold for giving a jury instruction. This means that if, before trial, the defendant proffers "some" evidence to support her defense theory and if that evidence, viewed most favorably to her, would allow a jury to conclude that her theory was not disproved beyond a reasonable doubt, the factual basis for her defense theory has been satisfied.

*Head*, 255 Wis. 2d 194, ¶ 115. Schmidt contends that unless an offer of proof is to become a mini-trial, a defendant must be given some latitude in the admission of provocation evidence. Thus, he asserts, a trial court should admit any evidence that is relevant to a mitigation defense. In Schmidt's view, a court should examine "the relevancy and admissibility of each piece of proffered evidence," rather than whether the totality of the defendant's proffered evidence is sufficient to raise an issue as to adequate provocation.[4]

¶ 12.   The some evidence standard is already a low bar. *See State v. Peters*, 2002 WI App 243, ¶ 27 n.4, 258 Wis. 2d 148, 653 N.W.2d 300 ("The 'some' evidence standard is a relatively low threshold, in part because of the distinct functions of judge and jury."). Schmidt's proposed lower standard is really no standard at all. It would permit the wholesale introduction of evidence that would otherwise be inadmissible or irrelevant and

[4] In his reply brief, Schmidt appears to step back from, if not concede, his argument that the provocation evidence should be examined individually rather than as a whole. However, he clearly maintains that the standard for admissibility is something less than that for obtaining a jury instruction. Because Schmidt's position is not entirely clear, and the State has briefed the issue, we address it.

would unnecessarily prolong and complicate trials. A defendant could introduce all matter of unsavory evidence about his or her victim regardless of whether there was any potentially viable provocation defense. This would ultimately require the striking of substantial amounts of testimony, potentially from numerous witnesses. While the same risk necessarily exists under the already low "some evidence" standard, Schmidt's proposal opens the door too wide. We therefore reject Schmidt's "mere relevance" standard. The defendant's proffered evidence of provocation must be examined as a whole to determine whether the some evidence threshold is satisfied. It is an all-or-nothing determination as to whether the jury hears any evidence of the affirmative defense.

## B. Scope of evidence considered

¶ 13. We next address, and reject, the State's argument that, when undertaking the some evidence analysis, the only evidence relevant to the objective components of the adequate provocation defense is that conduct which occurs just prior to the crime.[5] The State contends the only exception to this rule is where the defendant is a battered spouse. The State's argument conflicts with case law and finds no support in the language of WIS. STAT. § 939.44.

¶ 14. Admittedly, the only relevant appellate cases where the defendant *successfully* argued he or she satisfied the burden of production as to adequate provo-

---

[5] The State does not contend that evidence of prior provocation is irrelevant to the subjective components of the adequate provocation defense, nor does it ultimately argue that Schmidt fails to satisfy the some evidence standard as to the subjective components.

cation were cases involving battered spouses. *See Felton,* 110 Wis. 2d at 509–11; *State v. Hoyt,* 21 Wis. 2d 284, 287, 128 N.W.2d 645 (1964). However, the supreme court utilized broad language in *Felton,* not limiting its holding to cases of battered spouses. The court held:

> While it is true that a defendant's background is not in general relevant to the objective test for heat of passion, the question is how an ordinary person faced with a similar provocation would react. The provocation can consist, as it did here, of a long history of abuse. It is proper in applying the objective test, therefore, to consider how other persons similarly situated with respect to that type, or that history, of provocation would react.

*Felton,* 110 Wis. 2d at 509–10. Indeed, the court suggested it was appropriate to also consider evidence of prior acts against those other than the battered spouse, namely, the prior sexual abuse of the victim's daughters. *Id.* at 511. In any event, the court has in fact considered evidence of prior provocation in other cases not involving battered spouses when undertaking the some evidence analysis.

¶ 15.  For example, in *State v. Lucynski,* 48 Wis. 2d 232, 236–37, 179 N.W.2d 889 (1970), the court considered the prior acts of the victim in its analysis of the objective component of adequate provocation. However, the victim was not Robert Lucynski's spouse; rather, the victim was a man who had previously engaged in "home-defiling activities" with Lucynski's wife. *Id.* at 237. The victim had lived in Lucynski's home while dating his daughter, and Lucynski had obtained a judgment for money he loaned the victim during that time.

¶ 16.  The court explained, "*Hoyt* stands for the proposition that actions over a long period of time can have 'cumulative effect upon any ordinary person so that

347

the provocation just before the shooting would be greatly magnified.' " *Id.* at 235. The court further observed, "Here, as in *Hoyt*, we have a series of provocative incidents preceding the day of the actual shooting." *Id.* at 236. Ultimately, the court held the objective component of the heat of passion defense was not satisfied because the provocation immediately prior to the murder—the victim's refusal to pay the money owed—was unrelated to the prior affair with Lucynski's wife. *Id.* at 237. Nonetheless, the court's analysis is inconsistent with the State's argument that prior acts of provocation are always irrelevant except in the case of battered spouses.

¶ 17.   The State cites *State v. Williford*, 103 Wis. 2d 98, 116, 307 N.W.2d 277 (1981), in further support of its argument that acts prior to the murder are irrelevant to the adequate provocation defense. *Williford*, however, merely held that the prior acts there, alone or in tandem with the immediate provocation, did not rise to the level of adequate provocation. *Id.* at 120. Thus, having actually considered the prior provocation in its analysis, *Williford* does not support the State's position.

■
¶ 18.   We further observe that the State has not argued that Wis. Stat. § 939.44(1)(b), which defines "provocation," itself imposes any temporal restrictions upon the evidence that may be considered. Rather, the statute requires only that the proffered acts had a causal effect upon the defendant's loss of self-control at the time of the crime. *See id.* Thus, if the victim's prior acts could contribute to a reasonable person's loss of self-control at the time of the crime, the acts are relevant to the objective component of the defense.[6]

---

[6] The scope of prior acts evidence that may be *relevant* is necessarily vast. But, as we concluded above, evidence of prior

348

C.    Whether the evidence placed the adequate provocation defense in issue

¶ 19.    Having set the stage, we now consider whether Schmidt presented sufficient evidence of adequate provocation to place the affirmative defense in issue. That is, did Schmidt present "some evidence," such that a jury could reasonably conclude he shot Wing-Schmidt while under the influence of adequate provocation. We hold that he did not.

¶ 20.    As noted, Schmidt provided written offers of proof concerning numerous witnesses in addition to his *in camera* testimony. His adequate provocation argument here, however, relies primarily upon the *in camera* testimony, and exclusively upon evidence from Schmidt.[7] For our purposes, we must construe the evidence in Schmidt's favor. *See Head*, 255 Wis. 2d 194, ¶ 113.

¶ 21.    Schmidt and Wing-Schmidt married in April 2006, and had two children together, Kyan and Cassidi. Additionally, Wing-Schmidt had three children from prior relationships, all of whom resided in the family home. Schmidt had one child from a prior marriage, Max, who lived elsewhere. During their marriage, Wing-Schmidt threw Schmidt out of the house multiple

provocation is not admissible merely because it is relevant. It becomes admissible on the issue of adequate provocation only if the defendant satisfies the some evidence threshold.

[7] The State's response criticizes a handful of the witness synopses from Schmidt's written offer of proof. Schmidt replies that the State merely picked the weakest of the numerous summaries. Schmidt did not, however, discuss the witnesses' expected testimony in his initial brief.

times, but the couple always reconciled. The shooting occurred at a time when Schmidt was not living in the home.

¶ 22.   Schmidt contends Wing-Schmidt had been "emotionally and psychologically abusive" during their turbulent relationship. Schmidt explained that Wing-Schmidt did not get along with his family. She threatened to have his sister removed as godparent of their oldest child and refused to permit his parents to attend the baptism of their youngest child on threat of calling the police. Once, when Schmidt returned after taking Kyan to his parents' home on Kyan's birthday, she came out of the house screaming at him, extremely upset that he had done so. Wing-Schmidt gave him an ultimatum that he had to choose between her and their children, or Max and his parents, thereby isolating him from his family. In December 2009, when she kicked him out of the house within a week after he was released from the hospital after sustaining serious injuries in a car accident, she became irate when he stayed at his sister's house.

¶ 23.   Schmidt explained that his children were his world. In the year or more prior to the shooting, Wing-Schmidt began making frequent comments that the children were not his "f'ing kids," they did not like him, they did not think of him as their dad, and that they would be taken from him. Schmidt knew how she had obtained full custody of her children by other fathers, including making things up, to the point where the fathers were not part of their children's lives. He also knew that she and her mother had told the children unfavorable things about their fathers until the children wanted nothing more to do with them. He feared Wing-Schmidt and her mother would do the same to him.

¶ 24. Wing-Schmidt also isolated Schmidt from friends. She told him she did not want him to spend time with a friend with whom he hunted and fished; publicly accused him of cheating with a friend's wife; and emailed a female friend of his accusing her of having an affair with him. She also belittled and swore at him in front of friends and told him no one wanted to be around him because of who he was. She also embarrassed and hurt him by having an affair with Chad Lindsley.

¶ 25. The couple also had financial issues. The primary financial burden fell on Schmidt once Wing-Schmidt started school and worked only one day per week. Approximately a year and one-half before the shooting, Schmidt executed a mortgage on the lake home he owned prior to the marriage in order to pay off some debt, including $16,000 of Wing-Schmidt's credit card debt. Shortly before the shooting, Wing-Schmidt informed him this same credit card he thought was destroyed was "maxed out" at $14,000 and she had not made a payment for several months.

¶ 26. About three weeks before the shooting, Wing-Schmidt said she needed $400, which they did not have, to register for the paramedics exam, and she also pressured him to pay her mother $400 for watching the children for two weeks. Also, both of their vehicles were breaking down. Schmidt hoped the $5,000 tax refund they anticipated would alleviate some of the pressure, and he intended to use that money to replace Wing-Schmidt's vehicle. However, he learned two days before the shooting that Wing-Schmidt had the refund direct-deposited into her personal checking account and the money was already gone. Meanwhile, Schmidt was staying at the lake home, where the gas was shut off so

he could make sure the bills were paid where Wing-Schmidt and the children were living.

¶ 27.   Schmidt also stated, however, that much of their financial difficulty was due to the failed sale of the lake home in late 2007. He conceded that was due to the buyers backing out, and not attributable to anything Wing-Schmidt had done. Further, Schmidt's car accident and resulting serious injuries were apparently alcohol related, and he served home confinement because of it. Thus, his inability and reduced ability to work were of his own making.

¶ 28.   Wing-Schmidt also physically abused Schmidt. After a shoulder surgery in 2007, she would purposely hit him in the shoulder, knowing that nobody would believe him. Further, she "would hit herself, clawed at her face, [and] she'd punch, kick herself." While hospitalized after his car accident, she hit him with the phone and yelled at his parents and she had to be removed from the intensive care unit.

¶ 29.   Schmidt's *in camera* testimony was largely a rambling narrative, directed only by a few questions from the court. As to the alleged prior provocation, the court repeatedly asked Schmidt to explain how Wing-Schmidt's past conduct "entered into [his] mind at the time," "affect[ed his] state of mind," or how he "contemplate[d] these things." Schmidt variously responded:

> I guess to me it just was a combination of everything. There was no way—there was no way out anymore. There was— . . . I went there to defend my marriage and to keep my marriage together. I knew full well, or thought, I guess, in my mind that [Lindsley] was going to come and pick her up, and they were going to Chicago.
>
>      . . . .

The . . . week-and-a-half before that, I was out at the lake and I had wrote numerous suicide notes . . . or letters to the kids, letters to [Wing-Schmidt] . . . kind of telling them why I couldn't do it anymore, why—if I didn't have . . . my kids and my wife, it wasn't worth it anymore to go on. And I . . . lived on cigarettes and coffee. I didn't eat.

I don't know how I contemplated . . . all I knew is I was losing my wife and I was losing my kids.

. . . .

Yeah. I mean, they just constantly—I guess, like I said, it was going round and round in my head. Everything. From the house that we were going to build to—it was just—it was a mess. To the kids, to losing the kids, to losing [Wing-Schmidt], to the baptism of Kyan, to the baptism of Cassidi, . . . to [the father of two of Wing-Schmidt's children], to the way her mom treated my son [Max], the way [Wing-Schmidt] treated Max. You know, there was no—I took those kids in like they were my own.

. . . .

I guess it just kind of came to a head, overwhelmed, and eventually just got—they piled up one after another, just continuously year after year more stress was added.

And I guess really the big turning point for me was when . . . the sale of the house fell through. Um, there were more positives than negatives up to that point kind of. . . . But after that, it's like more negatives than positives.

And we—with getting in the accident, [Wing-Schmidt's mother] being around more, it just added more and more stress to an already stressful situation. It came to a head on the 17th.

353

■■■■

. . . .

The isolation, alienation, the trying to come up with the money to pay [her mother] to watch the kids, to keep food on the table when she was not willing to work . . ., the repeated verbal and physical abuse that nobody would believe me because of who—she's the female and I'm the guy.

. . . . I couldn't make a decision. I wasn't allowed to make a decision. I was told.

I mean, so many of those things tie in together with— just from—enjoying going hunting with my friends to union meetings to, I mean, no matter what I did, being accused of cheating by her, to taking my phone, breaking my phone. . . . .

And the constant accusations that just kept weighing down. And no matter what I did, it was never good enough. If I made more money, it wasn't good enough. Then I wasn't around enough. . . . .

. . . .

And it was just back—it was—I don't know. I don't know what the heck happened. I just—so much—so many of those things—I mean everything just added up. It was just weighing on my mind continuously.

. . . .

And it just—it was like every which way I turned nothing was good enough. And it was—but yet I was good enough for certain things. "You're good enough for this. If I need something, you're good enough. But otherwise, you're not. Get the hell away from me."

And that's how—I mean, that's—constantly the financial worries, the verbal abuse, the physical abuse . . . .

. . . .

354

We can't put the bullets back in the gun. You can't go back in time. I can't go back in my physical state, my mental state back. Everything was gone. And I loved her, and I still do. But there's days—there's days I hate her guts, and there's days I love her. And it just tore me up. I didn't know which way was up.

¶ 30.  Schmidt contends Wing-Schmidt also provoked him the day of the shooting. Schmidt stated he discovered a hotel receipt several days before the shooting which he believed indicated Wing-Schmidt was going to spend a weekend with Lindsley. Schmidt decided to go to the home and gather his tools from the garage to use on a job. He parked at the fire station where he worked because he was afraid Wing-Schmidt would call the police if she saw his vehicle in the driveway. While he was in the garage, two of the children came in, followed by Wing-Schmidt. The two had a normal conversation for a while, until Schmidt took the hotel receipt from his pocket and confronted her with it.

¶ 31.  Wing-Schmidt first stated she intended to take the kids to Chicago for the weekend. Schmidt responded that he did not believe her, because the reservation was for a single king bed. She replied, "It's none of your f'ing business. Why do you care anyways? These aren't your f'ing kids. And you're not going to see them." The two then argued about the kids and Lindsley.

¶ 32.  Schmidt then agreed to get the kids' bikes down and inflate the tires. Meanwhile Wing-Schmidt went inside. Schmidt recalled that his .22 caliber pistol was still stored in a cabinet in the garage, and he decided to take it with him because it was not safe to have near the kids. Thus, he grabbed it and put it in his pants. As Schmidt was finishing up with the bikes,

Wing-Schmidt came out and yelled at him to "get the frickin' bike tires done and get the F out of here. You're not welcome here. You're not—this isn't your home. You got your own home. These aren't your kids."

¶ 33.   Schmidt explained that then:

> [W]e argued and kind of struggled. We got in the house . . . . We got upstairs to the top of the stairs in the house, and she picked up the phone and threw it at me . . . . Somehow we ended up in the bathroom arguing about [Lindsley]. There were flowers on the table from him.
>
>       . . . .
>
> And she said, "Now you have nobody. . . . You don't have your parents. You don't have me. And you will never have your kids."
>
> . . . . And the next thing I know, she said, "Fine. Fine. I will take you back." And I looked at her and I said, "What?" She said, . . . "I'll take you back." And this is . . . she's probably told me this 20 times in our lifetime. And I said, "What about [Lindsley]?" "Well, I—I want to be with [Lindsley] instead. I'm not taking you back. . . . . [Lindsley] doesn't drink like you do. He doesn't smell like cigarette smoke like you do. He doesn't hunt. He doesn't fish. He doesn't do anything. He stays at home. . . . [H]e doesn't work all the time." . . . .
>
> And the next think I know, she's in my face. I heard [her mother] come into the house. . . . . And [Wing-Schmidt] pushed me. And as she pushed me, she noticed the gun that I had in my pants. And I . . . had totally forgot about it. It fell down my pant leg, . . . down to my ankle. And she went running out of the bathroom and said something to her mother like, "Mom, take the kids. He's got a gun." . . . And she ran by me. And [her mother] looked at me and said . . . something like, "Scott, what the hell are you doing here?" . . . .

And at that point I ran down the stairs after [Wing-Schmidt], and I [threw] open the door, and I heard a gunshot. And to this day . . ., I don't know where she was or where I was. I just heard the shot. I don't remember seeing the gun or nothing. I just remember hearing the frickin' shot. And then she was over by . . . her van, and she was bleeding . . . from her head.

And then [her mother] came outside. I remember that. She came at me, and I pushed her away. And I heard the gun go off again.

¶ 34.  Because the "some evidence" standard presents such a relatively low burden, it is a close question whether Schmidt placed the objective component of the adequate provocation defense in issue. Nonetheless, we agree with the State that Schmidt did not meet his burden of production.

■

¶ 35.  We also reject, however, the State's characterization of the objective component, that "[a]n ordinary person . . . would not have reacted . . . by shooting [Wing-Schmidt] four times, including twice in the head." No reasonable person ever reacts to any provocation by killing the provocateur. No doubt, that is why the adequate provocation defense—unlike self-defense—is not a complete defense, but only mitigates the severity of the crime. Instead, Schmidt needed to show only that Wing-Schmidt's provocation could have caused a reasonable person to completely lose self-control at the time of the murder. *See* WIS. STAT. § 939.44(1). Stated otherwise, he needed to demonstrate that Wing-Schmidt's conduct was sufficient to induce the "highest degree of anger, rage, or exasperation" in an ordinarily constituted individual. *See* WIS JI—CRIMINAL 1012 (2006).

¶ 36.   As the adequate provocation inquiry is fact-driven, every case must, of course, be evaluated on its own merits. Yet, while the inquiry is not conducive to bright-line rules, prior cases are instructive. We find two cases helpful here.

¶ 37.   In *Felton*, the court found the objective component of the provocation defense satisfied. There, the defendant wife had been physically abused by her victim husband for twenty-three years. *Felton*, 110 Wis. 2d at 489–90. The beatings were regular and severe and continued through six pregnancies, even causing one miscarriage. The defendant was also sexually abused, suffered broken ribs, and would sometimes awaken in the night to find her husband beating or choking her. The husband also frequently threatened to kill her. Further, the frequency of abuse had escalated in the months preceding the shooting. *Id.* at 490. In addition, a clinical psychologist opined that Felton was detached from reality at the time of the crime because of the severe, recurrent abuse and "was in a state that anyone would be in under similar circumstances." *Id.* at 495.

¶ 38.   The history of abuse in the present case pales in comparison to *Felton*. The abuse here did not span decades, there was no sexual abuse, and the physical abuse was minimal. We acknowledge that *Felton* does not set a minimum threshold for what constitutes evidence of objective provocation. *See id.* at 511 ("It seems *clear* that the history of abuse, plus the provocation which occurred on the day of the shooting, was *clearly sufficient* . . . to raise a jury issue as to the objective facet of heat of passion.") (emphasis added). Nevertheless, *Felton*

is highly informative as an example of prior conduct that does rise to the level of objective, i.e., adequate, provocation.[8]

¶ 39.    We also agree with the State that *Muller v. State*, 94 Wis. 2d 450, 289 N.W.2d 570 (1980), is instructive. In *Muller*, the defendant learned of his wife's potential infidelity a month prior to the crime. *Id.* at 461. One hour before the shooting, he learned the identity of the other man, "Pee Wee" Troxel, and received a description of his vehicle. Muller called his wife who first denied, but then admitted the affair. *Id.* at 462. She denied that Troxel was with her. Muller then drove to his wife's apartment and observed Troxel's vehicle parked outside, after 2 a.m. Muller ran up the stairs, kicked the door in, and ran past his sleeping children to the bedroom. He then "saw a hand come out of the bedroom and it had a pistol in it. The defendant grabbed the hand with the pistol, swung the person around, and the pistol broke free of his grip and discharged. The defendant could not remember anything after that." *Id.* at 459. The evidence showed that the semi-nude Pee Wee was shot three times—in the neck, shoulder, and chest. *Id.* at 455, 492.

¶ 40.    The court held there was insufficient evidence on the objective component of provocation. It explained, "This is not evidence showing sudden resentment or such 'reasonable, adequate provocation' as would overcome or suspend the exercise of judgment of

[8] Evidence of the subjective component of adequate provo cation, however, appears stronger here than in *Felton*. There, the defendant was intoxicated and she deliberated whether she should shoot her husband in his sleep prior to acting. *Id.* at 491–93, 512. Here, the State does not dispute that Schmidt, subjectively, acted in the heat of passion when he shot Wing-Schmidt.

an ordinary man, since the defendant was aware one month prior to the crime that a man had stayed overnight at his wife's apartment." *Id.* at 462.

¶ 41.  As in *Muller,* here Schmidt was not suddenly surprised by his wife's infidelity, much less did he come upon Wing-Schmidt's paramour in her bedroom in the middle of the night. Schmidt had already called Lindsley eight days before the shooting and told him, "Stay away from my fucking wife or I'll kill you." Thus, Schmidt's prior knowledge of Wing-Schmidt's affair negated the objective component of that provocation because there was an adequate cooling off period. *See also Williford,* 103 Wis. 2d at 116–17 ("even the most unreasonable of human beings would have cooled off and had time to reflect or deliberate" about events occurring two weeks or more prior).

¶ 42.  The same reasoning applies equally to Wing-Schmidt's stated intent to prevent Schmidt from seeing his children. Schmidt's offer of proof indicates that, beginning four months before the shooting, Wing-Schmidt repeatedly threatened that she would take Schmidt's children from him and that he would not see them. Schmidt's similar threats on the morning of her murder were merely more of the same. Likewise, Schmidt acknowledged that Wing-Schmidt had accepted him back only to reject him again some twenty times in the past. Thus, this too was nothing new to Schmidt.[9]

¶ 43.  Next, we address a few deficiencies in Schmidt's offer of proof. First, his offer of proof fails to

---

[9] We note that our preceding analysis, adopted from the State's argument, relies upon Wing-Schmidt's provocative conduct prior to the shooting. This is inconsistent with the State's position that the victim's past provocation is irrelevant to the objective inquiry.

explain how his revolver came to be loaded with nine live rounds of ammunition when it fell down his pants immediately before he lost control and shot Wing-Schmidt. No reasonable person would leave a loaded handgun stored in a garage where multiple children might access it. Thus, the only reasonable inference is that he loaded the pistol that morning. Second, Schmidt told police he intended to confront Wing-Schmidt when he went to her home that morning. Indeed, it is implausible that Schmidt still had the hotel receipt in his pocket days later, and just coincidentally happened to recall it was there while in the garage.

¶ 44. Thus, the immediate provocation—Wing-Schmidt's arguing with or taunting Schmidt prior to the shooting—cannot constitute objective adequate provocation. Schmidt himself was the initial provocateur. A reasonable person in Schmidt's situation would have expected that confronting Wing-Schmidt about her paramour would result in the very conduct which she undertook. If Schmidt acted in the heat of passion, it was because he deliberately chose to ignite the fire. Schmidt cannot incite a contentious argument and then legitimately argue that Wing-Schmidt's reciprocal provocation should mitigate his culpability. *Cf. Root v. Saul*, 2006 WI App 106, ¶ 26, 293 Wis. 2d 364, 718 N.W.2d 197 ("[A] defendant who is the initial aggressor can lose the right to claim self-defense, unless the defendant abandons the fight and gives notice to his adversary that he has done so."); WIS. STAT. § 939.48(2)(c) ("A person who provokes an attack, whether by lawful or unlawful conduct, with intent to use such an attack as an excuse to cause death or great bodily harm to his or her assailant is not entitled to claim the privilege of self-defense.").

*Right to Counsel at in camera Hearing*

■■

¶ 45. We next consider, and easily reject, Schmidt's argument that he was deprived of his right to counsel at the *in camera* hearing. Schmidt complains that his attorney, although present during the *in camera* testimony, was not permitted to participate and ask Schmidt questions.

¶ 46. The problem with Schmidt's argument is that the *in camera* hearing was merely a supplementary proceeding conducted for his benefit. The intent of the closed hearing was to prevent prejudice to him by minimizing disclosure of his defense to the State. Our supreme court suggested this very procedure recently in a self-defense affirmative defense case, *State v. McClaren*, 2009 WI 69, ¶ 34 n.12, 318 Wis. 2d 739, 767 N.W.2d 550. There the court explained:

> Any concerns that a defendant has concerning the disclosure potentially being used by the prosecutor in the case-in-chief could be addressed by an *in camera* review by the circuit court. Such a mechanism has been endorsed by the United States Supreme Court as a fair way of resolving disclosure disputes.

*Id.* (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987)). While, in retrospect, it may have been more efficient to have counsel guide Schmidt's testimony rather than having the court elicit an unguided narrative, a court has broad discretion in the conduct of its proceedings. *See* WIS. STAT. § 906.11(1); *State v. Payette*, 2008 WI App 106, ¶ 59, 313 Wis. 2d 39, 756 N.W.2d 423. We agree with the State that, since the prosecutor was barred from the hearing, preventing defense counsel from questioning Schmidt in a nonadversarial atmo-

sphere was a reasonable accommodation and not a violation of Schmidt's right to counsel.

¶ 47. Schmidt contends, however, that the *in camera* hearing was a "critical stage" of the trial at which he was entitled to the assistance of counsel. *See Bell v. Cone*, 535 U.S. 685, 695–96 (2002). Fatal to Schmidt's argument, the supplemental hearing was not the only opportunity for Schmidt to present his provocation evidence to the court. Indeed, Schmidt had already presented written offers of proof, and had the option to present whatever additional oral testimony he desired in open court. Schmidt merely chose not to present additional affidavits or testimony, of his own or from others, despite the court's explicit prior pronouncement that additional evidence would be permitted. Because the *in camera* hearing did not supplant Schmidt's opportunity to present evidence in support of his affirmative defense, we hold that it was not a critical stage.

¶ 48. In any event, we observe that, in the middle of the hearing, the court recessed to allow Schmidt to review his attorney's written offer of proof and speak with his attorney. Counsel was present for the entire *in camera* hearing. Thus, if counsel felt Schmidt or the court was overlooking something, or had any other concerns, there was an opportunity to so advise Schmidt. Likewise, Schmidt had the opportunity to present any concerns or questions he had to his attorney.

*By the Court.*—Judgment and order affirmed.