HRUZ, J.
¶1 Ashlee Martinson appeals a judgment of conviction for two counts of second-degree intentional homicide, as well as an order denying her postconviction motion for resentencing. Martinson and the State entered into a plea agreement whereby the State agreed to amend charges of first-degree intentional homicide to those of second-degree intentional homicide based upon the mitigating circumstance of adequate provocation. Among other things, the adequate provocation defense is premised upon a "complete lack of self-control" on the defendant's part. See WIS. STAT. § 939.44(1)(a) (2015-16).[1] Given this premise, Martinson argues the circuit court erroneously exercised its discretion at sentencing when it repeatedly stated that Martinson "had a choice" whether to kill the victims.
¶2 We reject Martinson's argument. We conclude that pursuant to the plain language of the relevant statutes, when the State stipulates to amend a first-degree intentional homicide charge to a second-degree offense based upon the mitigating circumstance of adequate provocation, it stipulates not to the fact that adequate provocation existed, but rather to its inability to prove beyond a reasonable doubt that facts supporting such a defense did not exist. Moreover, longstanding sentencing law permits a circuit court to reach its own conclusions about a defendant's character based upon the information before it. Because the record here contained information sufficient to support the sentencing court's comments regarding Martinson's volitional capacity to commit the murders, we affirm.
BACKGROUND
¶3 Martinson was charged in a criminal complaint with two counts of first-degree intentional homicide and three counts of false imprisonment. The State alleged that Martinson had killed her stepfather, Thomas Ayers, by shooting him in the head and neck, and that she had killed her mother, Jennifer Ayers, by stabbing her more than thirty times. After the murders, Martinson locked her three younger stepsisters in a bedroom.
¶4 The evidence at the preliminary hearing demonstrated that on March 6, 2015, which was Martinson's seventeenth birthday, she sent a Facebook message to her boyfriend. Martinson stated in the message that she was unhappy because her stepfather was beating her mother, and she said that she did not want to stay in the home. After Martinson expressed a desire to leave with her boyfriend, she said, "I fucking hate them, too. I want to kill him so fucking bad, just take one of his guns and blow his fucking brains out."
¶5 The following morning, Thomas and Jennifer discovered on the Internet that Martinson's boyfriend was twenty-two years old. Martinson's boyfriend then received a text message from one of the parents saying, "Stay the hell away from my daughter; she's a minor." Thomas confronted Martinson about her boyfriend's age, and ultimately Martinson's parents took away her cell phone and car keys. Martinson went to her bedroom, and Thomas went outside the house. When he later returned, Thomas asked one of Martinson's stepsisters where Martinson was, and he then went upstairs and started banging on Martinson's bedroom door.
¶6 One of Martinson's stepsisters, Ann, told police that she heard two gunshots after Thomas had ascended the stairs.[2] She told police Jennifer then ran up the stairs to find out what happened. Ann followed Jennifer and saw Martinson on top of Jennifer, fighting with her. Martinson instructed Ann to go downstairs, and Ann did so. Ann told police that a bloodied Martinson came downstairs after a time and put on cartoons for the children. Martinson then took a shower and instructed all three children to go into one of the girls' bedrooms, where Martinson placed food and drink and then locked them inside. Both Thomas and Jennifer died from their wounds. Martinson was ultimately apprehended in Indiana while traveling with her boyfriend.
¶7 At her arraignment, Martinson entered pleas of not guilty and not guilty by reason of mental disease or defect (NGI) to each of the five counts. The circuit court appointed Dr. Brad Smith to prepare an evaluation regarding Martinson's NGI pleas. The defense retained its own expert, Dr. Sheryl Dolezal. Both experts diagnosed Martinson with post-traumatic stress disorder and major depressive disorder. Both experts also concluded that their findings did not support Martinson's NGI pleas, with Smith in particular opining that Martinson had substantial mental capacity both to "appreciate the wrongfulness of her actions" and "to conform her behavior to the requirements of the law" at the time of the offenses.
¶8 Martinson reached a plea agreement with the State, whereby she agreed to withdraw her NGI pleas and plead guilty to two counts of second-degree intentional homicide. Unlike first-degree intentional homicide, which is a Class A felony carrying a penalty of life imprisonment, see WIS. STAT. §§ 940.01(1)(a) and 939.50(3)(a), second-degree intentional homicide is a Class B felony with a sixty-year maximum term of imprisonment, see WIS. STAT. §§ 940.05(1) and 939.50(3)(b). The State agreed to file an amended Information reflecting the reduced severity of the intentional homicide charges and dismissing the false imprisonment counts.
¶9 Both first- and second-degree intentional homicide require proof that the defendant caused the death of another human being with the intent to kill that person. Compare WIS. STAT. § 940.01(1)(a)with WIS. STAT. § 940.05(1). However, the first-degree intentional homicide statute sets forth a number of mitigating circumstances that constitute affirmative defenses to the first-degree charge, and that, if sufficiently demonstrated by the trial evidence and not disproven by the State beyond a reasonable doubt, mitigate the offense to intentional homicide in the second degree. Sec. 940.01(2), (3). Among these defenses is "adequate provocation." See § 940.01(2)(a). As part of the plea agreement with Martinson, the State conceded that the homicides "were caused under the influence of adequate provocation as defined in [ WIS. STAT. § 939.44 ]."
¶10 The parties also agreed to a lengthy stipulation setting forth the factual basis for the pleas. In addition to setting forth troublesome facts regarding Martinson's relationship with her biological father, the stipulation described significant physical and verbal abuse Thomas inflicted upon Jennifer and upon Martinson's stepsisters, including beatings with belts and threats with loaded firearms. Martinson witnessed or was aware of the incidents of child abuse, and she stated her mother would sometimes also physically abuse the children. However, Martinson denied that Thomas had physically or sexually assaulted her, although she reported constant "mental and verbal abuse" from Thomas, usually involving her failure to comply with "strict house rules." Martinson also stated that Thomas was "fond of killing baby animals in front of [the animals'] parents, and he would instruct [Martinson] and her sisters to watch the reaction of the parent animals to the death[s]."
¶11 The stipulation continues that after Martinson's parents confronted her about her boyfriend's age, Martinson gathered some belongings and made her way on foot to a neighbor's residence. Thomas followed Martinson in his truck and ordered Martinson to come home with him. Martinson then went to her bedroom and armed herself with one of the many loaded shotguns in the house. Martinson intended to commit suicide, but once Thomas returned to the house and began angrily pounding on her bedroom door, Martinson "considered whether Thomas Ayers should die rather than she."
¶12 The stipulation does not describe what happened immediately thereafter, but at some point Martinson fired a gunshot into Thomas's neck. Martinson then fired a second shot, this time to Thomas's temple, to "ensure that he was dead and could not hurt her." Jennifer made her way upstairs toward the sound of the gunshots. Martinson "sought comfort from her mother for what she had done," but instead Jennifer began yelling at Martinson. According to Martinson, her mother armed herself with a knife and approached Martinson, and a struggle ensued between the two. Martinson eventually gained possession of the knife and stabbed Jennifer repeatedly.
¶13 The parties agreed that Martinson "acted upon provocation premised upon a reasonable belief in the conduct of Thomas Ayers and Jennifer Ayers, completely losing control at the time of the commission of the homicides, demonstrating anger, rage and exasperation as a person of ordinary intelligence and prudence under similar circumstances would have done." The stipulation noted that the experts consulted with respect to Martinson's NGI plea had agreed that Martinson had personally experienced physical, sexual and verbal abuse during her lifetime, had witnessed the physical and verbal abuse of her mother and stepsisters, and had suffered neglect by her mother.
¶14 The circuit court determined that permitting amendment of the Information was in the public interest, observing that the facts set forth in the stipulation revealed an "extraordinary series of abuses" that would compromise, to a "legitimate extent," the State's ability to secure convictions for first-degree intentional homicide. Specifically, the court determined the record was sufficient to conclude that a reasonable jury would be "within its rights to find that the State had not disproven adequate provocation beyond a reasonable doubt," and it therefore accepted Martinson's pleas to second-degree intentional homicide and found her guilty of those offenses.
¶15 At the sentencing hearing, and after taking statements from some of the surviving victims, the circuit court heard arguments on behalf of the parties. Pursuant to the plea agreement, the State argued for consecutive sentences of twenty years' initial confinement on each count. It also recommended the maximum allowable amount of extended supervision. As the prosecutor explained why he viewed the circumstances of the case as aggravated, defense counsel interjected and requested a sidebar, apparently to discuss whether the prosecutor's comments were compatible with the State's stipulation as to adequate provocation. The prosecutor clarified that he was not challenging whether adequate provocation existed but, rather, explaining why a harsher sentence than the defense would be arguing for was warranted. In that regard, the prosecutor emphasized that Martinson had given several different descriptions of the manner in which the murders occurred, that the murders were of a particularly violent nature, that Martinson appeared to have little remorse, and that Martinson's conduct following the murders was not indicative of a person who was trying to protect her younger siblings. The prosecutor also mentioned that although prior abuse had undisputedly occurred, there were times during which the family appeared happy, and he argued that a message needed to be sent to the community that murder was not an acceptable response to abuse.
¶16 The defense's presentation consisted of testimony from one of Jennifer's former employers and Dr. Dolezal. Defense counsel emphasized Martinson's young age, the trauma and abuse she had suffered, her lack of a prior criminal history, and her mental illness. Defense counsel also argued that the provocation in this case produced a state in Martinson that was "pretty close to insanity." The defense recommended a sentence of eight years' initial confinement followed by thirty years' extended supervision.
¶17 After reciting the legal standards applicable to its sentencing decision, the circuit court began its remarks by stating that the seriousness of the offenses was "the paramount aspect of this situation." The court acknowledged that there was adequate provocation satisfying the statutory definition under WIS. STAT. § 939.44 and that there was substantial evidence regarding the abusive circumstances of Martinson's life. It perceived its task at sentencing as reconciling "two diametrically opposed forces," which were the fact that Martinson's acts were among "the gravest of crimes" that a person can commit and the fact, among others, that she lived in an "ongoing, abusive environment ... [that] came to a head in March of 2015 when these acts were committed."
¶18 The circuit court considered Martinson's character, which it described as "a combination of a normal teenager mired in abusive circumstances who suffers from bona fide mental illnesses." Although the court remarked that Martinson did not appear to have a "bad character," it concluded the seriousness of the offenses and the fact that Martinson had "something inside of her ... that allowed her to do these things" were more substantial considerations. The court explicitly considered Martinson's age, rehabilitative potential, and lack of prior criminal offenses. The court also stated it did not believe Martinson presented a risk to kill again, and there was no need for a sentence fashioned to protect the public.
¶19 However, the circuit court again emphasized the grievous nature of Martinson's acts. Although the court determined the evidence was "not consistent with a preplanned endeavor," and it expressed sympathy for Martinson's experiences and her abusive circumstances, it concluded "sympathy must yield in the face of the truth, and part of the truth of what's happened here is that two people were killed" in a violent manner. The court reasoned that whatever Thomas and Jennifer had done, "they did not deserve to die at the hands of the defendant in the manner in which they were killed." Given the circumstances, the court found "ample support in the record" justifying the second-degree intentional homicide charges, and it concluded that the maximum penalty of forty years' initial confinement on each count was not required.
¶20 In determining the proper amount of incarceration, the circuit court then shifted its attention to "one of the primary focuses of the discussion in this case"-the "proposition that the defendant did not have a choice":
Doctor Dolezal spoke about the fact and testified and her testimony I find to be psychologically supported that the defendant did not believe that she had a choice. The report of Doctor Smith indicates, and Doctor Dolezal did not necessarily address this explicitly, but her testimony did not refute it. Doctor Smith concluded that the extent of Ms. Martinson's mental illness though real did not deprive her of an appreciation of the wrongfulness of her conduct and also did not deprive her of her ability to conform her conduct to the law.
The existence of the defendant's mental illness as it applies to her character and to the situation as a whole is a mitigating factor, but I don't believe that it refutes the proposition that the defendant did have a choice on March 7th of 2015 and, in my judgment, the most important point that needs to be made by way of this proceeding is that yes, the defendant had a choice.
....
I believe it's true to say that while the quality of your life was severely affected by the continuing presence of Thomas Ayers, your life itself was not threatened. You did have a choice.
It's possible that at that moment a friendly hand on your shoulder or a kind voice to say wait, don't do this, may have been enough to stop this from having happened. I recognize the fact that there was no friendly hand or kind voice available to you and that there had not been for a lengthy period of time, but even without that kind of support, society expects its citizens, I believe even 17-year-old citizens, to find the strength within themselves to stop themselves from pointing a 12 gauge shotgun at someone and pulling the trigger. Again, you did have a choice.
¶21 After these remarks relating to Martinson "hav[ing] a choice," the circuit court again recognized that although "many aspects of this case that weigh in favor of the defendant relative to her character and the need to protect the public and many other factors," the gravity of the offenses and the rights of the public called for a sentence in excess of the eight years' initial confinement proposed by the defense. The court ultimately imposed concurrent forty-year sentences, each consisting of twenty-three years' initial confinement and seventeen years' extended supervision.
¶22 Martinson filed a motion for postconviction relief, asserting the circuit court erroneously exercised its sentencing discretion by stating that Martinson had a choice whether to commit the murders. Martinson argued "the idea that [she] 'had a choice' is deeply antithetical to the defense of adequate provocation," which requires that the intended victim has done something to cause a complete lack of self-control in the defendant. See WIS. STAT. § 939.44(1). According to Martinson, the sentencing court failed to consider "that the adequate provocation that ... existed at the time of the defendant's actions rendered her, as a matter of law, incapable of making rational choices."
¶23 At the motion hearing, the circuit court acknowledged Martinson's sentence was based in part upon the notion that she had a choice in her conduct. The court also recognized a tension between the concept of a person acting with intent for purposes of WIS. STAT. § 940.05(1) and the concept of a person acting with a complete lack of self-control for purposes of the adequate provocation defense. The court therefore found WIS. STAT. § 940.01 and § 940.05 ambiguous, and it relied upon the legislative histories of those provisions to resolve that ambiguity. Ultimately, the court concluded, as a matter of law, that a person found guilty of second-degree intentional homicide on the basis of adequate provocation is not absolved of volitional responsibility for his or her actions, and further that the applicable statutes did not foreclose a sentencing court from considering that a person under those circumstances had a choice. The court entered a written order denying Martinson's postconviction motion. Martinson now appeals.
DISCUSSION
¶24 "It is a well-settled principle of law that a circuit court exercises discretion at sentencing." State v. Gallion , 2004 WI 42, ¶17, 270 Wis. 2d 535, 678 N.W.2d 197. We will not reverse a circuit court's sentencing determination unless the court erroneously exercised that discretion. Id. "Under that standard, we will sustain discretionary acts if we find the circuit court examined the relevant facts, applied a proper standard of law, and using a demonstrative rational process, reached a conclusion that a reasonable judge could reach." State v. Firebaugh , 2011 WI App 154, ¶5, 337 Wis. 2d 670, 807 N.W.2d 245.
¶25 Martinson's only argument is one of law, and it is a narrow claim at that. Namely, she contends the statutes governing adequate provocation (which are WIS. STAT. §§ 940.01, 940.05, and 939.44 ) prohibit a circuit court, in cases such as this one, from basing the defendant's sentence in part upon a consideration that the defendant had a choice in his or her actions.[3] Although Martinson concedes that she could be convicted of intentional homicide in that she "had the choice not to pull the trigger," she argues that by operation of the statutorily based adequate provocation defense, she was, "as a matter of law, unable to exercise that choice, even if she had perceived it." Thus, Martinson reasons, the circuit court's consideration at sentencing of any "choices" she made regarding her offenses is necessarily an improper exercise of discretion.
¶26 In addressing Martinson's argument, our first task is to analyze the meaning of the statutes governing the adequate provocation defense to determine what, precisely, the State stipulates to when it agrees to amend a first-degree intentional homicide charge to a second-degree charge based on adequate provocation. Statutory interpretation presents a question of law that we review de novo. State v. Williams , 2014 WI 64, ¶16, 355 Wis. 2d 581, 852 N.W.2d 467.
¶27 When we interpret a statute, we begin with the statute's language. Id. , ¶17. If the meaning of the statute is plain, we typically end the inquiry. Id. We give statutory language its common, ordinary and accepted meaning, except that technical or specially defined words or phrases are given their technical or special definitional meanings. Id. In analyzing a statute's plain language, we consider surrounding or closely related statutes, and we will avoid interpretations that produce absurd or unreasonable results. Id. Sometimes a statute is capable of being understood by reasonably well-informed persons in two or more senses, producing ambiguity. Id. , ¶19. Under such circumstances, the court may consult extrinsic sources of meaning such as legislative history to arrive at a proper interpretation. Id.
¶28 Again, Martinson argues the statutes involving the adequate provocation defense are unambiguous and establish that she did not have a choice whether to kill. She therefore claims the circuit court's reliance on legislative history was "inappropriate and violative of the primary canons of statutory construction." The State concedes the court need not have relied on legislative history, instead arguing that the statutes unambiguously permit the circuit court to opine at sentencing about the volitional nature of the defendant's conduct. As the State points out, we may affirm on grounds different from those relied on by the circuit court. See Vanstone v. Town of Delafield , 191 Wis. 2d 586, 595, 530 N.W.2d 16 (Ct. App. 1995).
¶29 We agree with the State that the relevant statutes are unambiguous regarding the issue in this case, and they do not prohibit a circuit court in a case of stipulated second-degree intentional homicide from opining at sentencing regarding the defendant's volitional capacity to commit murder. As described above, the existence of adequate provocation is an incomplete defense to the charge of first-degree intentional homicide in that it mitigates the crime to that of intentional homicide in the second degree. See WIS. STAT. §§ 940.01(2)(a), 939.44(2).
¶30 "Adequate provocation" is a statutorily defined term. See WIS. STAT. § 939.44. The word "adequate" means "sufficient to cause complete lack of self-control in an ordinarily constituted person." Sec. 939.44(1)(a). "Provocation" means "something which the defendant reasonably believes the intended victim has done which causes the defendant to lack self-control completely at the time of causing death." Sec. 939.44(1)(b). We have recognized that a "complete loss of self-control" is "an extreme mental disturbance or emotional state. It is a state in which a person's ability to exercise judgment is overcome to the extent that the person acts uncontrollably. It is the highest degree of anger, rage, or exasperation." State v. Schmidt , 2012 WI App 113, ¶6, 344 Wis. 2d 336, 824 N.W.2d 839 (quoting WIS JI- CRIMINAL 1012 (2006)). These are the definitions on which Martinson relies in asserting that she was "incapable of making rational choices," contrary to the circuit court's sentencing remarks.[4]
¶31 While Martinson focuses on the definitional aspects of adequate provocation, the key to this case lies in the statutory directives regarding the burden of proof. The defendant initially bears the burden of producing some evidence to support an adequate provocation defense.[5] Id. , ¶8; WIS. STAT. § 940.01(3). "Once a defendant successfully places an affirmative defense in issue, the State is required to disprove the defense beyond a reasonable doubt." Schmidt , 344 Wis. 2d 336, ¶8. Within this burden-shifting framework, it is important to note that this scheme represents only the mitigation of the crime's severity based upon the "complete lack of self-control," § 939.44(1)(a), that derives from a person being under the "highest degree of anger, rage, or exasperation," Schmidt , 344 Wis. 2d 336, ¶35. It is not a complete defense that absolves the defendant of criminal liability. Id.
¶32 A defendant may be convicted of second-degree intentional homicide in only two circumstances. First, a conviction may obtain if, in a prosecution for first-degree intentional homicide, "the state fails to prove beyond a reasonable doubt that the mitigating circumstances specified in s. 940.01(2) [including adequate provocation] did not exist as required by s. 940.01(3)." WIS. STAT. § 940.05(1)(a). A defendant may also be convicted of second-degree intentional homicide if "[t]he state concedes that it is unable to prove beyond a reasonable doubt that the mitigating circumstances specified in s. 940.01(2) did not exist. By charging under this section, the state so concedes." Sec. 940.05(1)(b). The latter scenario is applicable to this case.
¶33 Reading WIS. STAT. §§ 940.01 and 940.05 together, it is apparent the effect of the State's stipulation and amendment to the charges in this case was to agree that it could not meet its burden of showing beyond a reasonable doubt that Martinson was not acting under the influence of adequate provocation when she committed the murders. There is a critical distinction between a concession that the State could not meet its burden of disproving adequate provocation and a concession that adequate provocation existed. Although Martinson argues that the State's stipulation has the latter effect, the statutes unambiguously provide that the stipulation had only the former effect. Accordingly, nothing in the text of WIS. STAT. §§ 940.01, 940.05, and 939.44 precludes a circuit court from remarking upon and independently evaluating the defendant's volitional capacity at sentencing in cases of stipulated second-degree intentional homicide based on adequate provocation.
¶34 Having concluded that the circuit court's comments regarding Martinson's volitional capacity were not incompatible with the statutes governing the adequate provocation defense, we next observe that existing sentencing law generally permits the consideration of such matters. Martinson's argument blurs the well-recognized distinction between the fact finder's function at the guilt stage of criminal proceedings-where the fact finder must determine whether the government has proven a defendant's guilt beyond a reasonable doubt-and the sentencing judge's role-which is to "assess the defendant's character using all available information," unconstrained by the rules of evidence that govern in the guilt phase. State v. Arredondo , 2004 WI App 7, ¶53, 269 Wis. 2d 369, 674 N.W.2d 647 (2003).
¶35 The distinction between the guilt and sentencing phases arises by virtue of the circuit court's mandate at sentencing to "acquire 'full knowledge of the character and behavior pattern of the convicted defendant before imposing sentence.' " State v. Allen , 2017 WI 7, ¶30, 373 Wis. 2d 98, 890 N.W.2d 245 (quoting State v. Leitner , 2002 WI 77, ¶45, 253 Wis. 2d 449, 646 N.W.2d 341 ). The sentencing court must be permitted to consider "any and all information that reasonably might bear on the proper sentence for the particular defendant, given the crime committed." Wasman v. United States , 468 U.S. 559, 563 (1984), cited with approval in Allen , 373 Wis. 2d 98, ¶30.
¶36 Indeed, a sentencing court may even consider "uncharged and unproven offenses and facts related to offenses for which the defendant has been acquitted." Allen , 373 Wis. 2d 98, ¶30. This case is not dissimilar from Arredondo , in which we held that a sentencing court did not erroneously exercise its discretion by stating that although it accepted that the defendant had been acquitted of a prior sexual assault charge, the acquittal did "not compel [the court] to agree with it." Arredondo , 269 Wis. 2d 369, ¶53. A sentencing court may properly consider the facts underlying an acquittal in evaluating the defendant's character. Id. , ¶55.
¶37 Although Martinson was in a sense "acquitted" of first-degree intentional homicide, the circuit court could nonetheless properly consider the facts underlying the second-degree intentional homicide charge to reach its own conclusions regarding Martinson's culpability for the lesser offense when sentencing her for that crime. As just noted, existing sentencing law permits a circuit court to make its own assessment of the defendant's character using all the accurate factual information available to it. Here, such information would include whether Martinson had the volitional capacity to commit the acts of murder despite the State's stipulation that it could not disprove adequate provocation beyond a reasonable doubt.
¶38 Martinson does not develop any argument that, by the terms of the specific plea agreement in this case, the State conceded anything more than it was required to under the relevant statutes.[6] However, even if the State stipulated to the fact of adequate provocation as opposed to its inability to satisfy its burden of proof, this difference still does not help Martinson here. A circuit court is not bound by the prosecutor's sentencing recommendation "or any other term of the defendant's plea agreement," State v. Hampton , 2004 WI 107, ¶42, 274 Wis. 2d 379, 683 N.W.2d 14, and it "has an independent duty to look beyond the recommendations" and to consider all relevant factors to arrive at the appropriate sentence within the statutory maximum, State v. Smith , 207 Wis. 2d 258, 281, 558 N.W.2d 379 (1997).
¶39 Finally, the appellate record here contains ample support for the circuit court's statement that Martinson had the volitional capacity to decide whether to kill. Indeed, the factual stipulation reflects that Martinson paused her suicidal ideations to "consider[ ] whether Thomas Ayers should die rather than she." The day before the homicides, Martinson sent a text message expressing her desire to kill Thomas with a gun-a message that, while not necessarily reflective of any sort of premeditated plan or scheme to commit the offense, could be properly viewed by the sentencing court as reflecting a conscious decision in the moment the offense occurred. Additionally, both the State and defense experts agreed that Martinson possessed the ability to conform her conduct to the requirements of the law at the time the offenses occurred. Under the circumstances here, we conclude the circuit court did not erreoneously exercise its sentencing discretion when it considered that Martinson had a choice whether to kill.
By the Court. -Judgment and order affirmed.
Not recommended for publication in the official reports.

All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

Pursuant to the policy underlying Wis. Stat. Rule 809.86, we will use pseudonyms to refer to the surviving victims in this case.

The State proposes that we may summarily reject Martinson's argument because she "does not cite any authority" holding that the circuit court was prohibited as a matter of law from considering whether she had a choice to kill under the circumstances present here. We typically do not consider arguments unsupported by references to legal authority. See State v. Pettit , 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992). However, this doctrine does not apply merely because there is no prior case directly on point. Martinson's statutory citations, upon which her argument is based, are plainly sufficient citation given the nature of her proposed rule, which flows entirely from her interpretation of the relevant statutes. Although we ultimately disagree with Martinson's interpretation of the statutes, we decline the State's invitation to apply this appellate forfeiture doctrine here.

The definitional statute regarding adequate provocation has both a subjective component-which requires that the defendant actually believe the provocation occurred and caused the lack of self-control-and an objective component-which requires that a reasonable person would consider the provocation sufficient to cause a complete lack of self-control and that the defendant reasonably believed the provocative acts occurred. State v. Schmidt , 2012 WI App 113, ¶7, 344 Wis. 2d 336, 824 N.W.2d 839.

Our supreme court has held that long-term physical abuse and public humiliation "would have a cumulative effect upon any ordinary person" such that a jury might be properly instructed on a provocation defense even if the victim's acts immediately preceding the murder would not be sufficient on their own to place the defense in issue. State v. Hoyt , 21 Wis. 2d 284, 291, 128 N.W.2d 645 (1964).

Additionally, Martinson does not argue the State in any way breached the plea agreement. Any such argument would be futile, as the plea agreement specifically stated that the information therein was provided for the limited purpose of setting forth a factual basis for the guilty pleas and was "not a full recitation of the defendant's knowledge of, or participation in, these offenses." Additionally, both parties explicitly reserved the right to provide the circuit court with "any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors."
These provisions in the plea agreement are consistent with case law prohibiting the State from concealing relevant information at sentencing. For example, the State could not agree to conceal from the circuit court facts suggesting that, despite the State's acquiescence to the second-degree intentional homicide charges, Martinson had acted with intent that would otherwise have been sufficient to support charges in the first degree. See State v. Williams , 2002 WI 1, ¶43, 249 Wis. 2d 492, 637 N.W.2d 733 (holding an agreement to keep relevant information from the sentencing judge is "against public policy and cannot be respected by the court").